LUCILLE E. KISTNER, f.k.a. LUCILLE E. WEASEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent *
Kistner v. Commissioner
Docket No. 32084-87
United States Tax Court
T.C. Memo 1995-66; 1995 Tax Ct. Memo LEXIS 67; 69 T.C.M. (CCH) 1873; February 8, 1995, Filed *67 Decision will be entered for petitioner. For petitioner: Jerald S. Beer and Patrick J. Casey. For respondent: Claudine D. Ryce. SWIFT
SWIFT
SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: This matter is before the Court on remand from the Court of Appeals for the Eleventh Circuit in Kistner v. Commissioner, 18 F.3d 1521 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463. Petitioner and her then husband, George E. Weasel, Jr., filed joint Federal income tax returns for 1979 and 1980. Respondent originally determined deficiencies in petitioner's and Mr. Weasel's Federal income tax of $ 533,391 for 1979 and $ 1,166,011 for 1980. Respondent has since revised her deficiency determinations to $ 162,808 for 1979 and $ 589,591 for 1980. These revised deficiencies relate solely to constructive dividends received from Tem-Cole, a closely held family corporation. All section references are to the Internal Revenue Code in effect for the years at issue. The primary issues presented at trial were whether petitioner and/or Mr. Weasel received constructive dividends from a family-owned corporation, and whether *68 petitioner was entitled to relief from any Federal income tax liability for 1979 and 1980 as an innocent spouse under section 6013(e). After trial, in Kistner v. Commissioner, T.C. Memo. 1991-463, we concluded that petitioner and Mr. Weasel had received constructive dividends from their family-owned corporation. We also concluded that petitioner did not qualify as an innocent spouse because she did not satisfy section 6013(e)(1)(C), one of the four requirements of the innocent spouse relief provision. On appeal, the Court of Appeals for the Eleventh Circuit reversed our decision and held that petitioner did satisfy section 6013(e)(1)(C), and the Court of Appeals remanded the case to this Court solely to determine whether petitioner satisfies section 6013(e)(1)(D), the fourth requirement of the innocent spouse relief provision. The only issue now before us, therefore, is whether, under section 6013(e)(1)(D), it would be inequitable to hold petitioner liable for the tax deficiencies for 1979 and 1980. FINDINGS OF FACT We adopt in full the findings of fact in our prior memorandum opinion. For convenience, we repeat below some of the important findings *69 of fact, and we make additional findings of fact. Petitioner resided in West Palm Beach, Florida, at the time she filed her petition. On December 5, 1943, at the age of 17, petitioner married George E. Weasel, Jr. Petitioner's formal education ended after the 11th grade, and Mr. Weasel's formal education ended after the 8th grade. Between 1945 and 1960, petitioner and Mr. Weasel had six children. In 1945, Mr. Weasel organized Tem-Cole as a sole proprietorship business to grow, package, and market radishes. From approximately mid-October to mid-May of each year, Tem-Cole grew radishes on leased land in Belle Glade, Florida. From approximately mid-May to mid-October of each year, Tem-Cole grew radishes on leased land in Sturgis and Kalamazoo, Michigan. After harvesting, the radishes were transported to McClure, Ohio, where Tem-Cole operated a processing plant to sort and package the radishes. Although petitioner occasionally worked in the radish processing plant in McClure, Ohio, petitioner was never involved in the financial, management, or legal affairs of Tem-Cole. In 1956, at a cost of $ 80,000, Mr. Weasel had a family residence built on 10 acres of land in McClure, Ohio *70 (the McClure residence), across the highway from Tem-Cole's radish processing plant. Sometime after 1956, a swimming pool, tennis court, clubhouse, and airplane landing strip were constructed adjacent to the residence. The tennis court, clubhouse, and landing strip were located on a separate parcel of property. In 1957, Mr. Weasel incorporated Tem-Cole with 60,000 shares of stock being issued as follows: 59,754 shares to Mr. Weasel, 156 shares to petitioner, and 90 shares to Mr. Weasel's father. In subsequent years, Mr. Weasel made annual gifts of Tem-Cole stock to his wife and children. Mr. Weasel was the president of Tem-Cole and in all years controlled all aspects of Tem-Cole's business. Mr. Weasel had a dominating personality, exercising complete control over Tem-Cole's operations and control over petitioner and their children. Mr. Weasel verbally and physically abused petitioner, and he had a severe drinking problem. Petitioner often felt compelled to follow any demand made of her by Mr. Weasel. On January 22, 1974, petitioner and Mr. Weasel entered into a marital separation and support agreement. By 1974, Mr. Weasel's net worth was almost $ 4 million, and in 1974 and *71 1975 Mr. Weasel received cash dividend distributions from Tem-Cole of approximately $ 1.4 million and $ 1.3 million, respectively. Between 1973 and 1977, Mr. Weasel received total compensation from Tem-Cole ranging from $ 167,964 to $ 325,032, not including the dividend distributions. On March 17, 1977, petitioner and Mr. Weasel were divorced. Under the terms of the property settlement agreement entered into incident to the divorce, in addition to receiving child support, petitioner was to receive $ 225,000 each year as "guaranteed income", consisting of a combination of cash dividends paid on petitioner's shares of Tem-Cole stock and cash which would be paid to petitioner by Mr. Weasel. [1]
*72 The property settlement agreement also provided that Mr. Weasel would convey to petitioner his interest in the McClure residence, which he did by quitclaim deed on March 19, 1977. At this time, Mr. Weasel owned approximately 40,000 shares of Tem-Cole voting stock, and petitioner owned 3,456 shares of Tem-Cole nonvoting stock. By 1978, Mr. Weasel's net worth had reached approximately $ 8.6 million. By this time, Tem-Cole had become the largest producer of radishes in the United States, harvesting 20 square miles of radishes each year and selling radishes in almost every part of the country except the Southeast. On October 17, 1978, petitioner and Mr. Weasel entered into an amended property settlement agreement under which petitioner agreed to convey her ownership interest in the McClure residence back to Mr. Weasel and to convey to Tem-Cole her ownership interest in the adjacent property on which the landing strip, tennis court, and clubhouse were located. In exchange, Mr. Weasel agreed to convey to petitioner a residence of comparable value not to exceed a cost of $ 250,000. Pursuant to the October 17, 1978, amended property settlement agreement, petitioner reconveyed to Mr. *73 Weasel her interest in the McClure residence, and petitioner quitclaimed to Tem-Cole her interest in the adjacent property. Mr. Weasel, however, did not convey to petitioner the residence contemplated in the agreement. In spite of the divorce in 1977, petitioner and Mr. Weasel continued to live together at the McClure residence during 1978 and early 1979. On March 5, 1979, petitioner and Mr. Weasel were remarried. During the 1979 and 1980 winter growing seasons, petitioner and Mr. Weasel resided together in a condominium in Atlantis, Florida. During the 1979 and 1980 summer growing seasons, petitioner and Mr. Weasel resided together at the McClure residence in Ohio. During 1979 and 1980, Mr. Weasel had investments in several real estate limited partnerships in Texas, and he was involved in the racing and breeding of horses. Some of the bookkeeping for Mr. Weasel's horse racing and breeding activities was done by Tem-Cole's payroll officer, and some of the expenses relating to these activities were paid by Tem-Cole. During 1979 and 1980, petitioner also owned interests in real estate limited partnerships from which she received income of $ 11,494 in 1979 and $ 17,229 in 1980. *74 In August of 1980, Mr. Weasel formed the George Weasel Consolidated Holding Co., Inc. (the holding company), for the purpose of owning and managing all of the various aspects of Tem-Cole's business and some of Mr. Weasel's other business interests, such as his investments in real estate and racehorses. The shareholders of Tem-Cole received the stock of the holding company in exchange for their stock of Tem-Cole, with Mr. Weasel receiving voting stock in the holding company and the other shareholders receiving nonvoting stock. For convenience, we continue to refer to the holding company as Tem-Cole. Between July of 1979 and December of 1980, Tem-Cole owned three airplanes, including a Lear Jet, that were used extensively by Mr. Weasel. Most of the use of the airplanes related to Mr. Weasel's work for Tem-Cole or to Mr. Weasel's other business interests, but Mr. Weasel also used the airplanes to take a significant number of personal trips. Mr. Weasel used the planes for gambling trips to Atlantic City, to attend horse auctions, to watch his horses race, to fly his stepmother to Florida, and to take other vacations. Petitioner traveled with Mr. Weasel on several of these trips, *75 sometimes at his insistence. On a number of occasions, petitioner and Mr. Weasel traveled to Europe and the Caribbean, traveling on either commercial airplanes or on one of Tem-Cole's airplanes. Tem-Cole paid for many of the airfares on the commercial airplanes. However, the total amount of the travel expenses paid by Tem-Cole is unclear. In 1979, 1980, and early 1981, Mr. Weasel provided petitioner with a monthly cash allowance of $ 15,000. This $ 15,000 was paid to petitioner each month out of Mr. Weasel's personal account into which were deposited Mr. Weasel's salary and real estate investment income. In each of 1979 and 1980, Mr. Weasel bought petitioner a new Mercedes automobile. During 1979 and 1980, Tem-Cole owned and maintained an A-frame cabin at Grass Lake, Michigan. Mr. Weasel, who previously owned this cabin and sold it to Tem-Cole in 1978, continued to use the cabin to entertain family and friends. Petitioner visited this cabin once during the years in issue. During 1979, Tem-Cole owned a boat in Florida that was used by Mr. Weasel to entertain friends. In September of 1979, Tem-Cole distributed this boat to Mr. Weasel, but Tem-Cole continued to pay for maintenance *76 of the boat. Petitioner never used this boat. Tem-Cole maintained and landscaped the property adjacent to the McClure residence on which the clubhouse and tennis court were located. The clubhouse was used mostly to entertain Mr. Weasel's business associates and as a place where Mr. Weasel could drink either by himself or with his friends. Tem-Cole paid various other expenses of petitioner and of Mr. Weasel, including some legal expenses relating to the real estate investments in Texas, the maintenance and landscaping of the McClure residence, the cost of furnishing the Florida condominium, and utilities, repairs and painting of the residence of Mr. Weasel's stepmother. Tem-Cole also paid the expenses of chartering pleasure boats in Florida used mostly to entertain Mr. Weasel's friends. During 1979 and 1980, Mr. Weasel employed Fred and Elsie Robichaud to be caretakers of the Weasel residence and to be available to carry out Mr. Weasel's requests. The Robichauds' salaries were paid by Tem-Cole. At Mr. Weasel's request, during the winter growing seasons the Robichauds lived near the Weasels' residence in Florida, and during the summer growing seasons the Robichauds lived in *77 a trailer home on the grounds of the McClure residence in Ohio. Although petitioner did some of the work around the house, the Robichauds performed most of the gardening outside and domestic cleaning inside the residences, along with any other work requested by Mr. Weasel. Mr. Weasel had a draw account with Tem-Cole through which Mr. Weasel reimbursed Tem-Cole for some of the personal expenses of petitioner and of Mr. Weasel that Tem-Cole had paid. The record, however, does not establish the extent of such reimbursements to Tem-Cole. In April of 1981, petitioner and Mr. Weasel separated for the second time, and in November of 1983 they were again divorced. As part of a 1983 property settlement agreement, petitioner received a net lump-sum payment of $ 3,785,000, which Mr. Weasel paid out of the proceeds of the sale of his Tem-Cole stock. The amount of Mr. Weasel's net worth in 1983 is unclear, although the evidence establishes that it was somewhere in the range of $ 12-51 million. [2]
*78 On February 15, 1983, petitioner filed a lawsuit against Mr. Weasel on behalf of herself and other minority shareholders of Tem-Cole. In the lawsuit, petitioner claimed that Mr. Weasel was depleting the property of Tem-Cole by, among other things, drawing an excessive salary, by using funds of Tem-Cole to pay for personal travel, entertainment, and living expenses, and by diverting corporate property to Mr. Weasel's other unrelated businesses. The allegations in the complaint were not limited to any specific time frame but included 1979 and 1980. On their 1979 joint Federal income tax return, petitioner and Mr. Weasel reported wages from Tem-Cole of $ 482,417, miscellaneous income of $ 100,313, losses from Mr. Weasel's horse racing and breeding activities of $ 178,003, losses from various partnerships of $ 898,379, and itemized deductions of $ 22,548, for a net loss of $ 516,200. On their 1980 Federal income tax return, petitioner and Mr. Weasel reported wages from Tem-Cole of $ 400,000, miscellaneous income of $ 309,267, losses from various partnerships and other business interests of $ 1,003,768, losses from horse racing and breeding activities of $ 201,664, and itemized deductions *79 of $ 15,972, for a net loss of $ 512,137. On audit, respondent determined that in 1979 and 1980 petitioner and Mr. Weasel received constructive dividends from Tem-Cole in connection with petitioner's and Mr. Weasel's personal use of Tem-Cole's airplanes, the clubhouse next to the McClure residence, the boat in Florida, and Tem-Cole's Cadillac, and in connection with payments by Tem-Cole relating to the horse racing and breeding activities, personal travel, the chartered boats, the Florida condominium, the services of the Robichauds, legal fees relating to the Texas real estate investments, and various other personal expenses of petitioner and Mr. Weasel paid by Tem-Cole. In 1987, respondent timely mailed a statutory notice of deficiency to petitioner for 1979 and 1980. Respondent has not yet mailed a notice of deficiency to Mr. Weasel for these years apparently because respondent is awaiting final resolution of this case and is involved in separate settlement negotiations with Mr. Weasel. Mr. Weasel has signed a Form 872-A, extending the period of limitations for assessment indefinitely for 1979 and 1980. After trial, this Court held that petitioner and Mr. Weasel had in fact *80 received significant constructive dividends from Tem-Cole that were not reflected on petitioner and Mr. Weasel's joint Federal income tax returns for 1979 and 1980. That holding was not appealed. OPINION A spouse can be relieved of joint Federal income tax liability if he or she satisfies all four requirements of section 6013(e)(1), which provide as follows: (1) In general. Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial *81 understatement.
Apparently while before the Court of Appeals for the Eleventh Circuit, the parties stipulated that petitioner satisfies section 6013(e)(1)(A) and (B). On appeal, the Court of Appeals held that petitioner also satisfies section 6013(e)(1)(C) in that petitioner did not know, and had no reason to know, that there was a substantial understatement of income. The Court of Appeals, however, remanded this case to the Tax Court to make further findings regarding whether, under section 6013(e)(1)(D), it would be inequitable to hold petitioner liable for the deficiencies in tax relating to the unreported constructive dividends from Tem-Cole for 1979 and 1980. The innocent spouse relief provisions were enacted to remedy a perceived injustice that sometimes resulted from joint and several liability, and these provisions therefore should not be interpreted narrowly. Bokum v. Commissioner, 992 F.2d 1132, 1134 (11th Cir. 1993), affg. on other grounds 94 T.C. 126 (1990); Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975). In determining whether it is inequitable to hold *82 a spouse jointly liable, we should take the following into account: (1) Whether the spouse significantly benefited from the items omitted from gross income, Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989); (2) whether the spouse is deserted, divorced or separated, sec. 1.6013-5(b), Income Tax Regs.; and (3) all other relevant facts and circumstances, sec. 6013(e)(1)(D). After considering the evidence in light of these factors, and for the reasons set forth below, we find that it would be inequitable to hold petitioner jointly liable for the tax on the unreported constructive dividends from Tem-Cole. In determining whether petitioner significantly benefited from the unreported constructive dividends, we consider petitioner's level of support and standard of living during 1979 and 1980 in comparison to her level of support and standard of living during prior years. Sanders v. United States, supra at 168. Normal support will not be regarded as a significant "benefit" for purposes of section 6013(e)(1)(D). Sec. 1.6013-5(b), Income Tax Regs. Generally, normal support is measured by the circumstances of the *83 parties, as one person's luxuries may be another's necessities. Sanders v. United States, supra at 168. In this case, petitioner's standard of living during 1979 and 1980 was not unusual when compared to petitioner's accustomed lifestyle in prior years. See Mann v. Commissioner, T.C. Memo. 1992-191 (wife was not liable for tax deficiency stemming from husband's unreported embezzled income, where entertainment and travel expenses were not unusual, considering standard of living to which wife was accustomed). During 1979 and 1980, petitioner clearly lived a very affluent lifestyle. However, prior to 1979, petitioner was already living in the McClure residence, with its pool, clubhouse and tennis court, during one half of the year, and in the furnished Florida condominium during the other half of the year. Petitioner also was already benefiting from the domestic services of the Robichauds and the use of the A-frame cabin in Michigan. The extent of the personal use of Tem-Cole's airplanes prior to 1979 is unclear, but the evidence suggests that Tem-Cole did own airplanes prior to 1979 that were used by petitioner *84 and by Mr. Weasel. Petitioner's standard of living during 1979 and 1980 was also not unusual in light of Mr. Weasel's wealth and level of income. As mentioned, Mr. Weasel had a net worth of approximately $ 8.6 million in prior years, and he received in prior years annual dividend distributions and compensation totaling over $ 1 million. Petitioner and Mr. Weasel were divorced for a second time shortly after the years in issue. In connection with the second divorce, petitioner received a large net lump-sum payment of $ 3,785,000. The payment was made, however, from the proceeds of the sale of Mr. Weasel's stock, which he had acquired in years prior to 1979. The amount of this payment represents a relatively small portion of Mr. Weasel's $ 12-51 million net worth at the time of the second divorce. The source, therefore, of the $ 3,785,000 payment that petitioner received does not appear to be the unreported constructive dividends received from Tem-Cole. [3]
*85 Some of the other facts and circumstances that are relevant to our analysis are the fact that the company-owned boats, clubhouse, and A-frame cabin were used primarily by Mr. Weasel. Mr. Weasel, not petitioner, regularly drove the company-owned Cadillac for personal use. Although petitioner did benefit from the Robichauds' services, the Robichauds were hired by Mr. Weasel to carry out his requests. The noncorporate legal expenses paid by Tem-Cole related primarily to Mr. Weasel's Texas real estate investments. Tem-Cole's services and payments relating to Mr. Weasel's horse racing and breeding activities did not directly benefit petitioner. Mr. Weasel was the primary beneficiary of the use of the corporate airplanes, traveling throughout the country to see his horses race, to attend horse auctions, to inspect his real estate investments, or to go on vacations. Although petitioner accompanied Mr. Weasel on a number of these trips, some trips she went on only at his insistence, and the trips were not unusual in light of petitioner's prior standard of living and level of income. We conclude that petitioner did not significantly benefit from the unreported constructive dividends *86 received from Tem-Cole and that under section 6013(e)(1)(D) it would be inequitable to hold petitioner jointly liable for the 1979 and 1980 Federal income tax deficiencies. Because petitioner satisfies the other requirements of section 6013(e)(1), petitioner is entitled to innocent spouse relief. Decision will be entered for petitioner. Footnotes
*. This opinion supplements Kistner v. Commissioner, T.C. Memo. 1991-463.↩
1. Petitioner and Mr. Weasel anticipated that $ 100,000 would be paid to petitioner in cash dividends on petitioner's stock, and the other $ 125,000 would be paid to petitioner in cash by Mr. Weasel. The property settlement agreement directed that, regardless of the amount of cash dividends paid to petitioner, Mr. Weasel would pay to petitioner the difference between the amount of the dividends paid and $ 225,000.↩
2. In negotiations related to the second divorce in 1983, Mr. Weasel represented his net worth to be $ 12 million. In 1981, Mr. Weasel represented to a bank that his net worth was over $ 24 million. At trial, Mr. Weasel testified that his net worth at the time of his second divorce was $ 51 million.↩
3. A similar finding was made in Purcell v. Commissioner, 86 T.C. 228 (1986), affd. 826 F.2d 470↩ (6th Cir. 1987), where the receipt by the wife of the family home, a car, a $ 900,000 life insurance policy, corporate stock, and certain interests in real estate pursuant to a property settlement agreement did not disqualify her for innocent spouse relief because the property received had been acquired prior to the years in issue.