**In re Ellen Ann HINCKLEY, Debtor.**

**No. 99–3188–8B3.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Nov. 16, 2000.

**816**

Stephen R. Leslie, Stichter, Riedel, Blain, Prosser, P.A., Tampa, FL, for Debtor.

Terry E. Smith, Bradenton, FL, Chapter 13 Trustee.

Attorney General of United States/Department of Justice, C/O Mary A. Hervey, Washington, DC, for Internal Revenue Service.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

THIS CAUSE came on for final evidentiary hearing on the Amended Objection to the Internal Revenue Service's ("IRS's") Claim filed by Ellen Ann Hinckley ("Debtor"). The Court, having considered arguments by counsel, the entire record of this case, live testimony of the Debtor, and all other relevant evidence, enters the following findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52; Fed. R. Bankr.P. 7052. Preliminarily, the Court notes the parties filed cross Motions for Summary Judgment prior to the hearing. At the start of the hearing, the Court denied both Motions as genuine issues of material fact remain at issue.

### INTRODUCTION

The portion of the IRS's Claim at issue in this case involves an understatement of tax. The Debtor's Objection is based on 26 U.S.C. § 6015.[1] This Internal Revenue Code section governs what is commonly referred to as "innocent spouse" relief.[2]

---

1. Throughout this opinion, all section references are to Title 26 of the United States Code unless otherwise indicated.

2. Enacted in 1998, § 6015 replaced prior § 6013(e). *See* Internal Revenue Service Restructuring and Reform Act of 1998, Pub.L. No. 105–206, § 3201, 112 Stat. 734 (1998) (codified as amended at 26 U.S.C. § 6015 (2000)). Interestingly, a commentary in *Tax Notes Today* states that "[t]wo years after enactment, the innocent spouse statute is providing anything but relief to taxpayers, practitioners, the IRS, and the Tax Court, panelists agree at a June 13 Community Tax Law Project conference at the University of Richmond T.C. Williams School of Law...." Stratton, S. & Field, E., Innocent Spouse Issues Plague Practitioners, IRS, and Courts, *Tax Notes Today* (Wed., June 14, 2000). The article addresses many of the inconsistencies and difficulties practitioners and courts face when applying or interpreting the new language and concepts in § 6015. *Id.*

Specifically, the Debtor seeks relief under § 6015(b)(1)(C), alleging the Debtor "... did not know, and had no reason to know, that there was such an understatement." [3] Alternatively, the Debtor argues she "... signed the return[s] under duress." § 6015(c)(3)(C). [4]

The parties stipulated that all of the other elements under § 6015(b)(1) are met, including: joint returns exist for the years in question; [5] the returns contain "an understatement of tax attributable to erroneous items of one individual filing the joint return[s]"; [6] equity favors the debtor, [7] the IRS concedes, stating "... we have no evidence to support a finding that it's inequitable for her to have innocent spouse relief ... [w]e gave it to her for 1991."; [8] and the Debtor timely elected the benefits of innocent spouse relief when she filed her Objection to Claim. [9] The parties agree that whether the Debtor knew or had reason to know of the omission, and whether the debtor signed the returns under duress are the only two issues that need to be tried. [10]

The parties stipulated to the following facts for the purpose of the hearing: [11] The tax returns at issue are for the years 1994 and 1995. The Debtor signed tax returns for both of these years. [12] The tax deficiency solely concerns the failure to include as income the approximately $90,000.00 annual pension benefit received by Debtor's former spouse. [13]

### BACKGROUND FACTS

The Hinckley's married in 1961. [14] The couple have four grown children, ages 29 to 37 years. [15] During most of the mar-

3. Section 6015(b)(1) essentially affords the same relief found in former § 6013(e). *See* Tr. at pp. 9–10. Thus far, the Tax Court has on two occasions generally applied the case law analyzing § 6013(e) to cases under § 6015(b). *See Cheshire v. Comm'r of Internal Revenue*, 115 T.C. No. 15, 2000 WL 1227132 (T.C. Aug. 30, 2000) (page references unavailable); *Charlton v. Comm'r of Internal Revenue*, 114 T.C. No. 22, 2000 WL 626760 (T.C. May 16, 2000) (page references unavailable).

4. The IRS objected at trial to the defense of duress, arguing it was not sufficiently pled in the Debtor's Objection to Claim, and not brought to light during discovery. *See* Tr. at pp. 12–29. For reasons stated on the record in open court, the Court overruled the objection by the IRS and allowed the trial to proceed on the duress issue. *Id.*

The Debtor also argued § 6015(f) should afford her relief. For reasons stated on the record in open court, the Court concluded this relief is not within the Court's jurisdiction to entertain. Tr. at pp. 29–32. A recent decision by the Tax Court also supports this conclusion. *See Cheshire*, 115 T.C. No. 15, 2000 WL 1227132 (T.C. Aug. 30, 2000) (page references unavailable) (holding the Tax Court may review a denial of relief under § 6015(f) after an individual applies to the Secretary and is rejected, and overturning a portion of the Secretary's decision as an abuse of discretion). Here, the Debtor has never applied for § 6015(f) relief with the Secretary. *See* Tr. at pp. 11, 31–33. *See also Charlton*, 114 T.C. No. 22, 2000 WL 626760

(T.C. May 16, 2000) (page references unavailable).

5. *See* (b)(1)(A).

6. *See* (b)(1)(B).

7. *See* (b)(1)(D).

8. Tr. at p. 51.

9. *See* (b)(1)(E) & (c)(3)(C) (regarding duress). *See* Tr. at pp. 53–57.

10. Tr. at pp. 53–55. To some extent, the parties differed regarding the extent of a(b)(1)(C) analysis. The IRS asserts there is no need to reach the issue of whether the Debtor had a reason to know because, they argue, she had actual knowledge of the pension, which is sufficient to deny relief. *Id.* at p. 54. The Debtor asserts the reason to know analysis is relevant on these facts. *Id.*

11. Tr. at pp. 51–57.

12. Neither party was able to produce the original or a copy of the 1994 joint return at trial. The parties stipulated that it exists, and that the Debtor signed it, at the start of the trial. *See* Tr. at p. 50.

13. Tr. at p. 91.

14. Tr. at p. 59.

15. Tr. at p. 60.

riage, the Debtor stayed at home and cared for the children.[16] The couple separated in May of 1997,[17] and the marriage was dissolved on January 5, 1999.[18] Pursuant to the Marital Settlement Agreement, the Debtor was assigned Mr. Hinckley's pension benefit.[19]

The problems in this case began prior to the couple's separation when Mr. Hinckley decided in 1995 that the pension income was not taxable income. For the prior tax years that he received the pension, he reported it as income on the couple's joint returns.[20] Beginning with the 1994 tax return, he stopped including the pension as income because he thought it could be excluded from gross income under § 104 of the Internal Revenue Code.[21] The IRS did not agree.[22] On or about April 20, 1995, Mr. Hinckley penned a letter in response to the IRS's rejection of his theory.[23] He presented this letter to his wife for her signature, and she became aware for the first time of his position concerning the pension income.

## OPINION

### A. § 6015(b)(1)(C)

■ Whether the Debtor knew or had reason to know of the understatement of tax when she signed the 1994 and 1995

returns is the first question the Court must answer. The law is clear that it is not sufficient to merely conclude she primarily attended to home matters and deferred to her husband's judgment in business matters as a basis for relief, though that is the case here. *Kistner v. Comm'r of Internal Revenue*, 18 F.3d 1521, 1525 (11th Cir.1994). The Court must decide whether "a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted." *Id.* at 1525 (citing *Stevens v. Comm'r of Internal Revenue*, 872 F.2d 1499, 1505 (11th Cir.1989)).[24]

■ Under the law, this standard establishes a duty to inquire on the part of the person seeking innocent spouse relief. *Id.* The factors relevant to the Court's determination of whether the Debtor had a reason to know of the understatement include:

... (1) the alleged innocent spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of income, and

16. Tr. at p. 62.

17. Tr. at pp. 71–72.

18. Tr. at p. 73; Dep. Tr. at p. 22.

19. Dep. Tr. at pp. 42–43. A copy of the Marital Settlement Agreement can be found at IRS Exh. 7–3 (exhibits to Dep. of Debtor taken February 9, 1999). Admitted as IRS Exh. 7, Tr. at p. 102.

20. *See* Tr. at p. 92; IRS Exh.'s 7–4, 7–7, & 7–8 (exhibits to Dep. of Debtor taken February 9, 1999). Admitted as IRS Exh. 7, Tr. at p. 102.

21. 26 U.S.C. § 104; Dep. Tr. at pp. 83–4; Debtor's Exh. 4 (admitted Tr. at pp. 77–78).

22. *See* Debtor's Exh. 4. *See also* Dep. Tr. at pp. 118–119.

23. Debtor's Exh. 4, p. 1. The letter is in response to the "disallowance of our claim for refund." *Id.* Mr. Hinckley also amended returns around this same time in March of 1995. The amended returns covered at least two previous years, asserting the pension was not income and requesting a refund. *See* IRS Exh.'s 7–5, 7–9, & 7–8 (exhibits to Dep. of Debtor taken February 9, 1999). Admitted as IRS Exh. 7, Tr. at p. 102. Those prior amended returns are not at issue in this case.

24. This standard originated in the Fifth Circuit Court of Appeals case *Sanders v. United States*, 509 F.2d 162, 167 (5th Cir.1975). *See Stevens*, 872 F.2d at 1505. The standard applies in cases involving either omissions or deductions. *See id.* at n. 8. *But see, Reser v. Comm'r of Internal Revenue*, 112 F.3d 1258, 1267 (5th Cir.1997) (holding *Sanders* standard applied in omission cases, but adopting a different standard for deduction cases).

spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. *Id.* (citing same).

Applying these factors to the instant case, the Court reaches the following conclusions.

### 1. Debtor's Level of Education

When the Hinckley's married, the Debtor had a degree in nutrition from St. Mary's College.[25] She never completed any formal education in business or financial matters.[26] She worked from 1959 to 1961, holding jobs in the dietetics nutrition field, and as a fifth grade teacher.[27] She stopped working when she married Mr. Hinckley in 1961.[28] Thirty years later, she returned to college and earned a Masters Degree in Art History from the University of Cincinnati.[29] She returned to the workforce on a part-time basis in 1990 when she began to teach college courses.[30] She also worked as a substitute teacher on occasion.[31]

The Debtor's level of education is advanced in that she holds bachelor and master degrees in nutrition and art history, respectively. However, none of her higher education was directed toward the field of business, finance, or tax matters, nor did her employment contribute in any way to furthering her understanding in these matters. Thus, while her level of education is higher than the average person's, these endeavors do not appear to have prepared her to decipher tax matters.

### 2. Debtor's Involvement in the Family Finances

Mr. Hinckley held a Bachelor's Degree in Business and a Law Degree from Marquette University prior to marrying the Debtor. He later obtained a Masters of Law Degree in Taxation Law from Wayne State University in 1973, and a Masters in Business Administration from Xavier University in 1986.[32] Mr. Hinckley held various positions of responsibility in the insurance industry.[33] His career reached its height when he became President and CEO of Union Central Life Insurance Company ("Union Central"), a position he held for from 1985 to 1988. He was with Union Central from 1973 to 1988.[34]

Mr. Hinckley kept all business affairs strictly to himself.[35] He refused to discuss his work with his wife, keeping a permanent division between his business and personal lives.[36] He never discussed investment or tax strategies with her.[37] Typically, they maintained a joint bank account as well as individual accounts.[38] The Debtor never met with any attorney during her marriage until she met with a bankruptcy attorney.[39] Mr. Hinckley would bring her, for example, a completed

25. Tr. at p. 58.

26. Tr. at p. 58–9, 62.

27. Tr. at p. 60–62.

28. Tr. at p. 62.

29. Tr. at p. 63.

30. The Debtor's college teaching is discussed fully in her deposition. Dep. Tr. at pp. 17–22.

31. Dep. Tr. at pp. 111, 115.

32. Copies of Mr. Hinckley's degrees, as well as his admission to the Ohio bar, are in evidence. *See* Composite Exh. C. to Debtor's Mot. for Summ. J., found in Debtor's Exh. 9. Admitted Tr. at p. 69.

33. A detailed account of Mr. Hinckley's career is in evidence. *See* Debtor's Exh. 5. Admitted Tr. at p. 65–6.

34. Mr. Hinckley's work summary indicates Union Central is a "Four Billion Dollar Combination of Companies." *See id.*

35. Tr. at pp. 63–4.

36. Tr. at p. 63; Dep. Tr. at p. 29.

37. Tr. at pp. 63–4; Dep. Tr. at pp. 92–3.

38. Dep. Tr. at pp. 43–50.

39. Dep. Tr. at p. 92.

will to sign, but she never participated in the preparation of any legal documents.[40]

Throughout the approximate 37½ years of their marriage, Mr. Hinckley completed all tax returns for the family.[41] The Debtor testified it was a matter of pride for him to do so given his degree in taxation law.[42] She further testified that she had, on occasion through the years, signed blank tax returns.[43] The record is clear, she did not typically review the returns.[44] The Debtor has very little knowledge of the appropriate forms and schedules required when filing a tax return.[45] She was unaware that she signed amended returns (forms 1040X), on occasion, and did not understand the effect of these forms.[46] While Mr. Hinckley often had loose ends to settle with the IRS, until the difficulties addressed in this case surfaced, he always handled any problems with the returns without significant incident.[47]

The Debtor's involvement in the family's business and financial matters was merely routine. She balanced her own checkbook and paid household bills. However, she had absolutely no involvement in her husband's business endeavors, and was largely unaware of the details of the family's financial resources and debts. She was, however, aware of the pension income.

### 3. Lavish lifestyle

There is no evidence in the record that the Hinckleys indulged in any lavish expenditures during the years at issue.[48] In fact, there is evidence that financial difficulties plagued their last years of marriage when the couple underwent a significant reduction in income.[49] These difficulties also appear to stem from Mr. Hinckley's habits regarding the payment of financial obligations, and his theories on tax liability.[50]

### 4. Mr. Hinckley's Capacity for Evasiveness and Deceit

Some historical facts are very relevant to this point of the analysis. In October 1987, Mr. Hinckley suffered a severe head injury in a bicycle accident, requiring a month long hospitalization and seven operations to repair.[51] Following the accident, he was dismissed from his job as President and CEO of Union Central.[52] It is at this time that he negotiated a pension package, apparently through threatened litigation, the terms of which he never discussed with the Debtor.[53]

In the years following the dismissal from Union Central, he suffered other head injuries, and his mental acuity gradu-

---

**40.** Dep. Tr. at p. 92.

**41.** Tr. at pp. 69–70; Dep. Tr. at p. 79.

**42.** Tr. at p. 69; Dep. Tr. at p. 79.

**43.** Tr. at p. 70.

**44.** Dep. Tr. at p. 96.

**45.** Dep. Tr. at pp. 89, 108.

**46.** Dep. Tr. at p. 102.

**47.** Tr. at pp. 70–71.

**48.** The Debtor speculates that Mr. Hinckley's corporate expenditures at the expense of Union Central may have led to his dismissal in 1987. Tr. at p. 71.

**49.** Tr. at p. 76. Mr. Hinckley's salary in the year he left Union Central was $360,000, which he retained the first year after his dismissal. *Id.* The following year, the pension dropped to $300,000.00. *Id.* From the third year to the present, he received the approximately $90,000.00 at issue in this case. *Id.*

**50.** Dep. Tr. at p. 35. The Debtor also testified that she would give Mr. Hinckley paid bills to mail to creditors and he would send in some, but not others. *Id.* at p. 57.

**51.** Dep. Tr. at pp. 28–9. Mr. Hinckley's injury required extensive reconstructive surgery over a period of at least one and one half years, and included severe complications. *Id.*

**52.** Tr. at p. 71. The relationship between the two events is unclear in the record.

**53.** *See* Debtor's Exh. 4; Dep. Tr. at p. 66, 88.

ally declined.[54] The Debtor testified the decline was not readily apparent, and occurred over the better part of a decade.[55] During these years, Mr. Hinckley, once an astute businessman, became increasingly forgetful and irrational. In addition to the decline, in early 1997 the Debtor discovered over one hundred pages of typewritten notes regarding a secret life Mr. Hinckley had been leading for 25 years.[56]

Today, Mr. Hinckley resides in an assisted living facility at the Beachwood Home for Incurables in Cincinnati, Ohio.[57] This care is paid for by the Hinckley's eldest son.[58] There is no anticipated date for Mr. Hinckley to leave the nursing home.[59]

Mr. Hinckley's evasiveness and deceit concerning the family's finances is evident in the record. In addition to the Debtor's testimony regarding his lifelong secretiveness about all matters related to his business life,[60] the secret alternative lifestyle presumably required expenditures the Debtor could not have known about, or even guessed.[61] Other than the day-to-day household and family expenses, the Debtor was largely in the dark about all business and financial matters.

While she knew the amounts of, for example, the mortgage payment[62] and other household expenditures, she did not know the amounts of money the family had in savings, stocks, or other investments.[63] The Debtor testified she never even knew the amount of her husband's salary at Union Central until she prepared for the instant litigation in 1999.[64] She was, however, aware of the $7,500.00 per month income from the pension during the tax years in question.[65] She also began to take over all of the family's bill paying around 1994 to 1995 because her husband stopped paying their debts, due in part to the mental decline after his accident.[66]

There is also evidence in the record that Mr. Hinckley signed his wife's name on important documents without authorization on at least one occasion. Specifically, on March 9, 1995, a form 1040X was filed for the taxes due in 1993, amending the 1993 return and requesting a refund.[67] The Debtor testified at deposition and at trial that the signature on this form is not hers, but a forgery by her husband.[68] Mr.

---

**54.** Dep. Tr. at pp. 29–32.

**55.** Dep. Tr. at pp. 29–32.

**56.** Tr. at pp. 71–2; 82–3; Dep. Tr. at pp. 24–25. The Court also notes the discovery of this secret life precipitated the Debtor's separation from her husband. Tr. at pp. 71–2.

**57.** Dep. Tr. at pp. 33–4.

**58.** Dep. Tr. at p. 34.

**59.** Dep. Tr. at p. 34.

**60.** Dep. Tr. at pp. 29, 64.

**61.** Tr. at pp. 82–3.

**62.** Dep. Tr. at pp. 60, 74.

**63.** Dep. Tr. at p. 92.

**64.** Tr. at p. 63.

**65.** Tr. at p. 88. The Debtor knew of the $90,000 per year pension as early as 1991—

four years after Mr. Hinckley was terminated. Tr. at p. 88; Dep. Tr. at pp. 64–65.

**66.** Dep. Tr. at pp. 54–7.

**67.** IRS Exh. 7–9 (exhibit to Dep. of Debtor taken February 9, 1999). Admitted as IRS Exh. 7, Tr. at p. 102. The Court notes a 1040X for the 1991 tax year with the same theory regarding the exclusion of the pension from income appears as IRS Exh. 7–5 and bears what appears to be Debtor's signature. This 1040X is dated March 2, 1995, some 7 days prior to the date on the 1040X for 1993. *See* Exh. 7–9. The Debtor testified that Mr. Hinckley was very angry when she questioned signing the 1040X for 1991. Tr. at p. 79; Dep. Tr. at p. 86. She signed that document on March 2, 1995. Tr. at p. 79. As mentioned above, the IRS previously granted innocent spouse relief to the Debtor for other deficiencies for the 1991 tax year. *See* Tr. at pp. 14–15.

**68.** A review of the document in comparison to the other documents that bear her acknowledged signature supports the conclusion that someone else, presumably Mr. Hinckley, signed her name. *See* IRS Exh. 7–9 (exhibit

Hinckley also kept notices concerning the IRS from the Debtor, and later kept notices and information concerning the bankruptcy case from her, partly by insisting on collecting all of the couple's mail.[69]

Relying on his extensive legal and business background, and particularly his specialized degree in taxation law, Mr. Hinckley appears to have kept his own counsel with regard to all family financial and tax matters. He clearly felt qualified to prepare the family's tax returns, to make his own determination about the taxable nature of his pension income, and to propound his theory to the IRS.[70] He also made it very clear to his wife that any questions or concerns she had about his theory were grounded in her lack of education, and were ill-advised in light of his superior knowledge and skill.

### B. § 6015(b)(1)(C) Analysis

These factors may seem to suggest a conclusion that the Debtor might not have a reason to know that her husband of then 34 years, who had always prepared and paid their taxes, would suddenly develop a theory that their primary source of income should be tax free.[71] She simply signed their annual tax return. The difficulty arises in the fact that the Debtor signed

the April 20th letter to the IRS that detailed her husband's theory about the pension income at the same time the 1994 return is being filed.

### 1. The 1994 Return

As mentioned above, the Debtor became aware of her husband's unique theory regarding the taxable nature of his pension on or about April 20, 1995, when he insisted she sign the joint letter detailing his position to the IRS.[72] The record indicates the tax return for 1994 was filed May 1, 1995.[73] The Court concludes on this record, however, the Debtor did not actually know of the understatement in 1995 when the 1994 return was filed. In other words, she did not review the return and see the omission. She discovered the likelihood of the omission when her husband presented her with the April 20th letter.[74]

■ The Debtor asserts she did not want to sign the letter because she disagreed with its content.[75] Nevertheless, she did sign the April 20th letter, and in doing so, had a reason to know there was at least a strong potential that the return filed that same day[76] contained an understatement of tax. The Court believes that a reasonably prudent taxpayer would have

---

to Dep. of Debtor taken February 9, 1999). Admitted as IRS Exh. 7, Tr. at p. 102. The Debtor also testified that Mr. Hinckley, in connection with his pension settlement, signed her name to a document permitting the pension benefit to end at the death of her husband. Tr. at p. 76. The Court notes, however, that the Debtor also testified some years she never saw a tax return, that Mr. Hinckley signed her name. Dep. Tr. at p. 89.

**69.** Tr. at p. 95.

**70.** According to the Debtor's testimony, Mr. Hinckley was very confident about his theory. Dep. Tr. at pp. 83–4, 117–9.

**71.** Indeed, at this point, the Debtor did not know that Mr. Hinckley, as discussed previously, had already forged her signature twice; once in March of 1995 on a 1040X form amending their prior year's return, Tr. at p. 80, and once on a document that signed away

all of her rights to the pension income upon his death. Tr. at p. 76.

It also appears from the record that he initiated an Objection to Claim in the couple's original joint bankruptcy, based upon the same theory he espoused in the returns at issue, without Debtor's knowledge or consent. Dep. Tr. at pp. 86–89. That case was severed from the instant bankruptcy case on March 4, 1999. Finally, the Debtor testified at deposition that Mr. Hinckley sued the United States Government on behalf of both parties without her knowledge. Dep. Tr. at p. 87.

**72.** Tr. at p. 94.

**73.** The parties stipulated to this date. Tr. at p. 80.

**74.** Tr. at pp. 93–4.

**75.** Tr. at p. 94.

**76.** Tr. at p. 93.

questioned, as the Debtor admittedly did, the advisability of not reporting the income. At this point, the Debtor had a duty to inquire further—to at least ask to review the return before filing. She chose not to do so.[77] The law is clear that turning a blind eye cannot shield her from tax liability for the 1994 taxes. *See Stevens*, 872 F.2d at 1507. The Court determines the Debtor knew of the understatement when the 1994 return was filed.

### 2. The 1995 Return

The Debtor, by her own admission, signed the 1995 return in 1996 at a time when she knew of her husband's theory.[78] She admitted at trial that she knew the 1995 return did not include the pension income, and she knew of the position he had taken with the IRS.[79] The Court determines the Debtor knew of the understatement when she signed the 1995 return.[80]

### 3. Mental Abuse as a Factor

In the *Kistner* opinion, the Eleventh Circuit added a factor for consideration

under the reason to know analysis. In the context of what is now a § 6015(b)(1)(C) analysis, the *Kistner* Court stated that though an

> ... innocent spouse's complete deference to [a] husband's [sic] judgment ..., standing alone, is insufficient to establish that the spouse had no reason to know[,] ... where physical or mental abuse is shown, even when the abuse does not rise to the level of coercion, a basis may exist for allowing innocent spouse relief. *Kistner*, 18 F.3d at 1526.

Addressing a history of physical abuse in its facts, the *Kistner* Court reversed a Tax Court ruling that the spouse did not qualify for innocent spouse relief. The reasoning in *Kistner* factored the abuse history into the reason to know analysis, and remanded the case for further consideration, in spite of the fact that the spouse in its case did not assert that she signed the returns due to deception or coercion. *Kistner*, 18 F.3d at 1526.[81] Other courts have taken a similar approach. *See, e.g., Aude v. Comm'r of Internal Revenue*, 74 T.C.M. (CCH) 993 (T.C.1997).

---

**77.** Tr. at p. 94.

**78.** Tr. at p. 100.

**79.** Tr. at p. 100.

**80.** In light of its conclusion that the Debtor knew of Mr. Hinckley's omission of income on the returns in question, it is unnecessary for the Court to determine whether mere knowledge of the pension's existence, *i.e.* knowledge of the underlying transaction that produced the income, would be sufficient to deny innocent spouse relief. However, much of the case law suggests knowledge of the underlying transaction would be sufficient in omission cases. *See, e.g., Reser v. Comm'r of Internal Revenue*, 112 F.3d 1258, 1267 (5th Cir.1997); *Resser v. Comm'r of Internal Revenue*, 74 F.3d 1528, 1535 (7th Cir.1996); *Erdahl v. Comm'r of Internal Revenue*, 930 F.2d 585, 589 (8th Cir.1991) (discussing knowledge of the underlying transaction that produced income as the standard in cases involving omission of income in contrast to cases involving deductions that give rise to an understatement of tax); *Price v. Comm'r of Internal Revenue*, 887 F.2d 959, 963 at n. 9 (9th Cir.

1989) (same); *Purcell v. Comm'r of Internal Revenue*, 826 F.2d 470, 474 (6th Cir.1987) (applying the standard in omission case that knowledge of the transaction itself is at issue, not an understanding of the tax consequences of the understatement).

The Court further notes a finding of actual knowledge arguably obviates the need to apply the factors of the reason to know analysis. The IRS argued this point to the Court in this case. *See supra* note 10. However, in the interest of thorough analysis, there is no reason to ignore the factors. Further, there is no reason for the Court to make findings of fact regarding the factors and not record them in light of its ultimate conclusion. Other courts have blurred this line as well. *See, e.g., Wiksell v. Comm'r of Internal Revenue*, 67 T.C.M. (CCH) 2360 (T.C.1994).

**81.** On remand, the *Kistner* spouse was afforded innocent spouse relief in light of the appeals court ruling and further consideration of the equity of holding the spouse responsible. *See Kistner v. Comm'r of Internal Revenue*, 69 T.C.M. (CCH) 1873 (T.C.1995) (page references unavailable).

In the record before this Court, there is evidence of mental abuse to the Debtor. The *Kistner* Court explicitly recognizes the role of mental abuse, even short of actual coercion, in the innocent spouse analysis. However, in this case, unlike the spouse in *Kistner,* the Debtor is able to raise the issue of duress under the innocent spouse statute. In light of its conclusion that the Debtor had actual knowledge of the understatement of tax in this case, this Court finds it more appropriate to proceed with an analysis of whether those returns were a product of duress, rather than to examine whether long term mental abuse is per se a factor limiting the Debtor's knowledge. Because the Court finds the Debtor knew of the understatement of tax in both 1994 and 1995, it denies innocent spouse relief under § 6015(b)(1)(C), and turns to an analysis of the issue of duress.

## C. § 6015(c)(3)(C) Duress

■ The present innocent spouse statute explicitly excepts a taxpayer from liability, under certain circumstances, where the spouse establishes the tax returns in question were signed under duress. *See* § 6015(c)(3)(C). Proving the returns were signed under duress is the only avenue for relief where a Court determines the spouse "... had actual knowledge, at the time such individual signed the return, of any item giving rise to a deficiency (or portion thereof)...." *Id.* At trial, the parties presumed that if this Court determined the Debtor had actual knowledge under § 6015(b)(1)(C), that determination would suffice to establish actual knowledge under § 6015(c)(3)(C). However, whether the standards for actual knowledge in the two separate provisions are the same may be open to interpretation.

In a recent case, *Cheshire v. Comm'r of Internal Revenue*, 115 T.C. No. 15, 2000 WL 1227132 (T.C. Aug. 30, 2000) (page references unavailable), the Tax Court held "... the electing spouse must have an actual and clear awareness of the omitted income." *Id.* The Court further held the electing spouse need not know "whether the entry on the return is or is not correct." *Id.*[82] Under the facts in the instant case, this Court concludes the Debtor's knowledge of the omitted income is sufficient to establish actual knowledge under § 6015(c)(3)(C).[83]

■ As duress is not defined in the Internal Revenue Code, the Court must first look to case law for guidance. The law concerning the issue of duress and the filing of joint tax returns pre-dates the existence of modern innocent spouse provisions of the Internal Revenue Code. *See*

**82.** The *Cheshire* majority's holding is criticized in a lengthy dissent, which argues that a review of "... the legislative history unequivocally shows that the Congress intended to require the Commissioner to prove that the putative innocent spouse knew that his or her tax return was incorrect." *Cheshire,* 115 T.C. No. 15 (Colvin, J. dissenting, joined by Marvel, Gale, and Parr, JJ.) The dissent also criticizes the Tax Court's failure to address its earlier opinion in *Charlton,* 114 T.C. No. 22, 2000 WL 626760 (T.C. May 16, 2000) (page references unavailable), where the Tax Court drew a distinction between a spouse knowing of, and having access to, correct information under (b)(1)(C), and proof of actual knowledge under (c)(3)(C). *See Cheshire,* 115 T.C. No. 15 (Colvin, J. dissenting).

This Court also notes the reasoning in an even earlier Fourth Circuit opinion, *Grossman v. Comm'r of Internal Revenue,* 182 F.3d 275, 279–80 (4th Cir.1999), where the court held an individual ineligible for innocent spouse relief by inferring that the Tax Court's finding of civil tax fraud necessarily included a finding of actual knowledge of the omitted income. *Id.* Though the *Grossman* court concludes the putative innocent spouse's ineligibility is due only to his actual knowledge of underpayments, the court also noted he intended to defraud the IRS, thus implicitly including a conclusion that the individual knew of the error in the return. *See id.*

**83.** The Debtor testified that, at the very least, she suspected the returns were incorrect due to the omission of income. *See, e.g.* Dep. Tr. at pp. 41–42. Thus, even under the more stringent standard urged in the *Cheshire* dissenting opinion, this Debtor demonstrated actual knowledge. *See Cheshire,* 115 T.C. No. 15 (Colvin, J. dissenting).

*Furnish v. Comm'r of Internal Revenue,* 262 F.2d 727, 731–3 (9th Cir.1958); *Stanley v. Comm'r of Internal Revenue,* 45 T.C. 555, 560–61, 1966 WL 1239 (T.C.1966). In the *Furnish* opinion, the Ninth Circuit defined duress broadly: " 'Duress' may exist not only when a gun is held to one's head while a signature is being subscribed to a document. A long continued course of mental intimidation can be equally as effective, perhaps more so, in constituting duress." *Furnish,* 262 F.2d at 733. In contrast to the reasonable taxpayer under the reason to know analysis, the standard used in determining the existence of duress is wholly subjective. *Id.* Thus, the focus is on the mind of the individual at the relevant time in question, "rather than [on] the means by which the given state of mind was induced . . . ." *Stanley,* 45 T.C. at 561.

The definition of duress was further refined in the Tax Court's *Stanley* opinion. In *Stanley,* the court found that, though the spouse seeking relief in that case was the victim of long term physical abuse at the hands of her husband, she failed to prove she signed the returns in question under duress. *Stanley,* 45 T.C. at 564. Because she could point to no specific reason for her reluctance to sign the relevant returns, other than a general unwillingness, she did not prove that "but for" the threats, she would not have signed the returns. *Id.* at 563–64. The *Stanley* court stated "[n]ot only must fear be produced in order to constitute duress, but the fear must be a cause inducing entrance into a transaction, and though not necessarily the sole cause, it must be a cause without which the transaction would not have occurred." *Id.* at 564. Thus, while the *Stanley* spouse lived in constant fear of her husband's physical abuse, the required causal link between that fear and her signing the relevant returns was not established. *Id.*

The *Stanley* court concluded it lacked proof of a causal connection between the abuse and the signing of the tax returns, identifying the spouse's inability to articulate a specific reason for her reluctance to sign the relevant returns as one cause of the lack of proof. *Id.* at 563–64. Expounding on the difficulty of the missing causal connection, the court stated ". . . a reason or explanation for some opposition to signing would add support to [the spouse's] bare claim of unwillingness, just as proof of specific incidents at the time of the signing would add such support." *Id.* While proof of specific incidents at the time of the signing of the returns is not required to show duress, in the absence of a stated reason for the reluctance, proof of specific incidents becomes increasingly relevant. *Id.* at 564.

In the years following the *Furnish* and *Stanley* cases, courts continue to recognize duress as a defense to joint tax liability for innocent spouses. *See, e.g., Malkin v. United States,* 3 F.Supp.2d 493, 498–99 (D.Ct.N.J.1998); *Pirnia v. Comm'r of Internal Revenue,* 60 T.C.M. (CCH) 554 (T.C.1990) (page references unavailable); *Brown v. Comm'r of Internal Revenue,* 51 T.C. 116, 119–21, 1968 WL 1502 (T.C.1968). The analysis set out in *Stanley* is generally accepted in these cases, and is generally stated in two parts. *See id.*[84] The Court must determine that (1) the Debtor was unable to resist Mr. Hinckley's demands that she sign the returns, and (2) the Debtor would not have signed the returns without the constraint Mr. Hinckley placed on her. *See Malkin,* 3 F.Supp.2d at 499; *Pirnia,* 60 T.C.M. (CCH) 554; *Brown,* 51 T.C. at 119.

### Duress Analysis

As the test for defining duress is subjective, it is appropriate to examine the time in question from the vantage point of the Debtor. The Debtor testified that Mr.

---

**84.** This may be due in part to the *Stanley* court's clarification that a Federal standard of duress should be implemented when interpreting the Internal Revenue Code, rather than allowing the use of varied state laws. *See Stanley,* 45 T.C. at 561–2.

Hinckley had ". . . the most forceful will of any human being." [85] Always in complete control of the family's business matters, ". . . his word was law." [86] Throughout the course of their marriage, the Debtor and her family ". . . worked around [his personality] . . ." by avoiding any interference in the family business and tax matters.[87] It appears from the record that Mr. Hinckley had a dynamic presence and strong opinions.

The two years in question in this case come at an unusual and stressful time in the Hinckley's 37 year marriage history.[88] The couple had to move after many years of belonging to a community where Mr. Hinckley held a respectable and responsible position with a large company and played a leadership role in the business community;[89] the same community where the Debtor was involved in her own pursuits and in raising their four children.[90] The couple found themselves alone for the first time in years.[91] Mr. Hinckley struggled to find new employment, and never truly succeeded.[92] Mrs. Hinckley testified she felt very isolated after leaving all of her friends.[93]

During this time, the Debtor also began to notice the gradual decline of her husband's mental acuity and self control. Always forceful, he became belligerent and prone to "rages." [94] She testified that he would become ". . . like a rabid dog . . . ," that he would forget where he was, and that he was prone to throw and destroy items that were valuable to her.[95] She also testified that he was very cruel to their two and one half year old granddaughter, and that she felt this was because of her own close relationship to the child.[96] While Mr. Hinckley never physically attacked the Debtor, nor did he threaten to physically harm her, the Debtor testified specifically that she became very afraid he would kill her during those last two years together.[97] He did threaten to kill himself.[98] Those two years are also the years significant to the Court's inquiry.

At the time relevant to the signing of the tax returns in question, the Debtor testified she signed the returns only to placate her husband.[99] When she questioned him about the contents of the April 20th letter, he flew into a rage. He ordered her to sign the document and not to question his judgment in matters she did not understand. He became very agitated and, in the end, she signed.[100] He adamantly opposed her suggestion that she

---

**85.** Dep. Tr. at p. 28 (referring to his reaction to his 1987 head injury).

**86.** Dep. Tr. at p. 93.

**87.** Dep. Tr. at p. 92.

**88.** Tr. at p. 84.

**89.** Debtor's Exh. 5 (Mr. Hinckley's Curriculum Vitae).

**90.** Tr. at p. 62–3, 84.

**91.** Tr. at p. 84.

**92.** Dep. Tr. at p. 75.

**93.** Tr. at p. 84.

**94.** Dep. Tr. at p. 85.

**95.** Tr. at pp. 81–2; Dep. Tr. at pp. 84–5.

**96.** Tr. at pp. 82, 84; Dep. Tr. at p. 85. In her deposition, the Debtor recounts a particularly disturbing incident involving her husband and the grandchild. The Court will not recount the details here, but notes the incident evidences the extreme nature of Mr. Hinckley's controlling and domineering personality.

**97.** Dep. Tr. at p. 85.

**98.** Tr. at pp. 93–4; Dep. Tr. at p. 85.

**99.** Tr. at pp. 79–81; Dep. Tr. at p. 86.

**100.** The Court notes the Debtor testified that she stood up to Mr. Hinckley and argued with him about signing the letter, but he countered by telling her, "I have two law degrees and you have to do this and I am your husband and you have to sign this." Tr. at p. 77. The Debtor also testified that Mr. Hinckley was very angry when she questioned signing the 1040X for 1991, (IRS Exh. 7–5). She signed that document on March 2, 1995.

file a separate return.[101] She testified there was a similar argument the following year when she again questioned his theory about the pension income. In 1996, she capitulated again.

The Court notes at this point the significance of Mr. Hinckley not being an average tax protester. Federal jurisprudence contains many cases involving individuals who assert novel arguments such as "... they [are] not taxpayers within the meaning of the tax laws, that wages are not income, that the Sixteenth Amendment does not authorize the imposition of an income tax on individuals, and that the Sixteenth Amendment is unenforceable." *See Cheek v. United States*, 498 U.S. 192, 195, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991).[102] Many federal courts, including this Court, are very familiar with these arguments.

Unlike the typical tax protester, Mr. Hinckley has a graduate degree in taxation law. When he concluded that his income was excludable from gross income under § 104 of the Code, which governs compensation for injuries or sickness, he was not making a tax protester's usual frivolous argument.[103] Mr. Hinckley asserted that, rather than a pension, he actually received a settlement for foregoing tortious litigation against Union Central.[104] While the validity of this argument is not before the Court, and the Court makes no comment of the likelihood of success on the merits should Mr. Hinckley have pursued his theory in court, this Court notes the issues involved in his assertion are certainly being litigated by others.[105]

The IRS argues the Debtor did not prove duress because she failed to offer sufficient evidence of specific threats or incidents at or near the moment the Debtor signed the returns. Dismissing Mr. Hinckley's rages as shouting and arm waving, the IRS asserts that a continued course of mental intimidation is required for mental intimidation to rise to the level of duress.[106] The Court agrees that mental intimidation over a long period of time is recognized by courts as an effective way to constrain another individual's will. *See Furnish*, 262 F.2d at 733. However, the Court disagrees it is required to constitute duress by mental coercion. Further, while proof of specific incidents of threatening behavior at the moment of signing the tax return is significant, it is not the only proof a taxpayer must offer to prove duress. *See Stanley*, 45 T.C. at 563–64.

**101.** Tr. at pp. 81, 96.

**102.** *Accord Stoecklin v. Comm'r of Internal Revenue*, 865 F.2d 1221, 1224 (11th Cir.1989) (characterizing similar theories as patently frivolous); *McNair v. Eggers*, 788 F.2d 1509, 1510 (11th Cir.1986) (same); *see also, In re Bertelt*, 250 B.R. 739, 745–46, 748–50 (Bankr. M.D.Fla.2000) (rejecting similar arguments, including argument that Debtor's income is "foreign" income as Debtor resides in Florida, a state foreign to the United States); *Commonweal, Inc. v. Internal Revenue Service (In re Commonweal)*, 171 B.R. 405, 407–09, 411 (Bankr.M.D.Fla.1994) (piercing the corporate veil of Debtor as nominee of Stoecklin (*supra* this note) as sham to avoid taxes).

The IRS investigates illegal tax protesters and maintains records regarding the activities of these groups. *See Clarkson v. Internal Revenue Service*, 811 F.2d 1396, 1397 (11th Cir. 1987).

**103.** 26 U.S.C. § 104; Dep. Tr. at pp. 83–84.

**104.** A cursory examination of cases involving § 104 disputes reveals the standard to determine questions of the taxable nature of judgments or settlements requires a court to ask " '[...] in lieu of what was the judgment or litigation settlement awarded?' " *Srivastava v. Comm'r of Internal Revenue Service*, 220 F.3d 353, 365 (5th Cir.2000) (quoting *Knuckles v. Comm'r.*, 349 F.2d 610 (10th Cir.1965)). The intent of the payor, Union Central here, "... carries the most weight." *Id.* at 365–66. Had his theory ever gone to trial, Mr. Hinckley would have born the burden to prove it was excludable from income under § 104. *See Taggi v. United States*, 35 F.3d 93, 95 (2nd Cir.1994).

**105.** *See, e.g., Taggi*, 35 F.3d at 95.

**106.** *See* Post–Trial Br. by United States on Debtor's Objection to Claim, at p. 10 (citing *Furnish*, 262 F.2d at 733; *Pirnia*, 60 T.C.M. (CCH) 554).

828

In this case, the Debtor does not assert Mr. Hinckley held a gun to her head in order to force her to sign the joint returns in question. The record does establish, however, Mr. Hinckley is not an average husband. To begin with, he has a uniquely sophisticated and specialized knowledge of tax issues and law, especially when compared to the average person. During the thirty-plus years that he prepared the couple's tax returns, he brooked no argument, but also managed not to run afoul of the IRS in all of that time—until 1995.

Unlike the spouse in *Stanley*, the Debtor articulates a very specific reason for her reluctance to sign the returns in question—she thought his theory was very likely incorrect. Additionally, she testified she would not have signed the returns were she not afraid of what her husband would do, either to her, or to himself, if she refused. Thus, the signing of these returns took place at a time when the Debtor was in fear, and was reluctant to participate. She capitulated only to avoid further verbal and mental assaults from a strong willed, well-educated husband. At the time in question, Mr. Hinckley's unpredictability and volatility are reaching a peak that will ultimately end in his entering a nursing home. Under these conditions, the Court concludes, the Debtor's acts were not voluntary and were the product of duress.[107]

After viewing the Debtor's demeanor, hearing or reviewing her testimony, and considering other evidence, the Court finds she could not resist her husband's demands.[108] The Court also finds the Debtor

would not have willingly signed tax returns without the income included, but for Mr. Hinckley's constraint on her will. The Debtor signed the 1994 and 1995 tax returns while under duress, entitling her to innocent spouse relief under § 6015(c)(3)(C).

Accordingly, it is

ORDERED, ADJUDGED, AND DECREED that the Objection to Claim filed by the Debtor, Ellen Ann Hinckley, be, and the same is hereby, sustained. The Internal Revenue Service's claim is disallowed.

---

107. The Court notes it is not until the Debtor learns in early 1997 of the secret life her husband led for the last 25 years of their marriage, that she separates from him permanently. That year the Debtor filed her own separate tax return. She testified at trial that she reports the pension income to the IRS, which comes to her after the divorce, and she has Union Central withhold the tax from each check. It is only after the marriage ended that the Debtor sought outside opinions about the taxable nature of the income for the first time. Dep. Tr. at pp. 80–1, 104, 119.

108. *See Restatement (Second) of Contracts,* § 175 cmt. c. Regarding the subjective test of inducement integral to the duress analysis, the comment states: "All attendant circumstances must be considered, including such matters as the age, background and relationship of the parties. Persons of a weak or cowardly nature are the very ones that need protection; the courageous can usually protect themselves." *Id.*