OPINION. Raum, Judge: The Commissioner’s determinations of deficiencies for the entire period 1939-1949 are founded upon income earned solely by Richard Douglas Furnish. His former wife, Emilie Furnish Funk, is involved for the years 1939-1942 only because of the Government’s position that she filed joint returns with him and is therefore jointly and severally liable for the deficiencies.[1] Unless otherwise indicated he will be referred to as the petitioner. 1. Petitioner challenges at the outset the Commissioner’s determination of the correct taxable income for all the years, 1939-1949, inclusive. However, as to the year 1949, petitioner presented no evidence, and the Commissioner’s determination of net income for that year must therefore be approved. As to the remaining years, 1939-1948, petitioner does not contend that the income as reported was correct. Indeed, the aggregate net income reported for this period was $101,407.68, and petitioner admits that he received net income totaling $529,854.84 during these years, which was computed by his accountant using the net worth method. Petitioner challenges the Commissioner’s determination, which discloses an aggregate net income of $649,512.73 for this period. The issue is whether the Commissioner’s action was correct, or whether the method urged by petitioner more accurately reflects the income actually received. Of course, if we should accept the net worth method, there would have to be certain adjustments (resulting in additions to net income) in the aggregate amount of $14,792,[2] as spelled out in our findings; and there would also have to be a further adjustment increasing income by $4G,000, the amount of alleged accumulated cash as of January 1, 1939, since we did not believe the evidence that he had any such accumulation of cash or any accumulation of cash at all at that time. The end result of these adjustments would be that if we accepted petitioner’s method there would be an aggregate of $590,646.84 net income for the years 1939-1948 as contrasted with reported income of $101,407.68 for that period. In our view, the Commissioner correctly determined petitioner’s net income, and his method more accurately reflects the true state of affairs than the method proposed by petitioner. The Commissioner’s determination is based in large part upon receipts from patients reflected upon the patient record cards, as shown in the audit of those cards made by petitioner’s accountant, Hill. The Hill audit was made for the specific purpose of determining petitioner’s income from the practice of medicine, and it was submitted to the Government by petitioner’s attorney. Plainly, it was at least an admission by petitioner or by his attorney on his behalf that he had received the fees shown on that audit. In making the audit, Hill had the cooperation of petitioner’s office staff to help him interpret the cards whenver such interpretation was necessary. The audit was an extensive one, and, taking into account the fact that it was made by an agent of petitioner and presented to the Government on belialf of the petitioner, we must conclude that it is highly reliable evidence that petitioner’s fees from patients during the years in question were no less than the amounts shown on the audit. Certainly, it furnished strong support for the Commissioner’s determination. But the Commissioner did not let the matter rest there. His agent, in turn, made a spot check of the Hill report against the cards themselves. Not only did the agent find comparatively few errors, but such errors were generally in favor of the petitioner. The agent also had the assistance of petitioner’s office staff, and, at times, of petitioner himself, in interpreting the cards whenever any clarification was required. In these circumstances, the Hill report is powerful evidence that petitioner received at least the amount of fees shown therein. Petitioner now contends that both Hill and the Government agent did not properly interpret the cards, and undertakes to construct an argument based upon the use of certain symbols or words in tlie cards which, he says, were at least ambiguous and not understood by Hill or the Government agent. Some evidence was presented to us in this connection, the net effect oí which was not wholly clear. Although there may have been occasional errors, some of the errors were in petitioner’s favor, and it appears reasonable to conclude that, at worst, they neutralized each other. In any event, we do not believe that, with the continuous assistance of petitioner’s office staff and, at times, with the assistance of petitioner himself, both Hill and the Government agent misinterpreted the cards, and we have found as a fact that the actual gross receipts from patients were not less than those shown by the Hill audit. In determining net income for the years 1941-1948, the Commissioner included in gross income the receipts from patients,.unreported dividends, interest, and gains upon sale of properties, and he deducted not only claimed expenses but also such unclaimed expenses as were found in the course of the examination of the returns.[3] Petitioner has suggested that the Commissioner’s method fails to take into account fees which he paid to other doctors for sending patients to him. However, the record does not show that he ever made any such payments to other doctors. We are fully satisfied that the net worth method, although acceptable as a means of showing income where other, more precise methods are unavailable, is less accurate in the present case than the method used by the Commissioner. We find as a fact and hold that the net income determined by the Commissioner for each of the years in controversy is correct. 2. The Commissioner determined that part of the deficiency for each year was due to fraud with intent to evade tax. Except for the year 1949, which will be separately discussed below, the record contains clear and convincing evidence that the returns for 1939-1948 were false and fraudulent. The net income received was more than 6 times the net income reported over the 10-year period 1939-1948; and even if we accept petitioner’s present position as to the amount of income received it would be more than 5 times the amount reported. When viewed against the background of his method of handling his financial affairs, it is plain that such wide discrepancies were not the result of innocent mistake but were part of a calculated plan to defraud the Government. That he may also have intended to defraud his wife or other creditors does not detract from the fact that he knowingly understated his income on the returns with intent to evade tax. Cf. Jack M. Chesbro, 21 T. C. 123,130, affirmed 225 F. 2d 674 (C. A. 2), certiorari denied 350 U. S. 995; Morris Lipsitz, 21 T. C. 917, 937, affirmed 220 F. 2d 871 (C. A. 4), certiorari denied 350 U. S. 845. The amounts omitted were too large and the practice of underreporting extended over too long a period to have been the products of mere error. Cf. Harber v. Commissioner, 249 F. 2d 143 (C. A. 6). The record is replete with evidence corroborating this conclusion. In the first place, petitioner himself admitted to a Government agent that he may have been guilty of evasion, but sought to exculpate himself with the unilluminating explanation that “it was for my patients.” He resorted to various devices to conceal ownership of bank accounts, real estate, investments, and income that he realized upon the sale of property. During at least part of the period he would send patients’ checks to a sister in Kansas City, who cashed them, and after accumulating substantial amounts of cash would transmit it to him. His attempts to explain the use of dummies in his various transactions upon the ground that he wanted to conceal his assets from his wife and from undisclosed judgment creditors hardly explain his consistent failure to report very substantial amounts of income over the 10-year period. Again, when his business manager, Duelke, tried to induce him to install an adequate record system so that income could be checked by the Bureau of Internal Revenue, he dismissed the recommendation by inquiring how, “with 130,000,000 people,” he could be checked. He lied to Government agents in general about real estate and other transactions and in particular when he told them that he did not own the Hinton Arms. He also falsely told them that some of his files had been lost. The foregoing are but some of the circumstances of record pointing to fraud. In the aggregate, they afford strong and powerful proof that the returns for the years 1939-1948 were false and fraudulent and that at least a part of the deficiency for each year was due to fraud with intent to evade tax. The situation with respect to the year 1949 is different. The Commissioner did not undertake to present evidence showing petitioner’s income for that year. We, of course, approved the basic deficiency for that year, since the burden was upon the petitioner to prove that the deficiency was in error. As to the addition for fraud, however, the burden was upon the Government. Accordingly, the so-called fraud penalty cannot be sustained merely on the ground that petitioner failed to carry his burden with respect to the basic deficiency. Although the deficiency in tax for 1949 must be approved, the addition for fraud cannot stand on this record. The additions to tax for fraud with respect to the remaining years, 1939-1948, are sustained. 3. The limitations issue may readily be disposed of on the basis of our findings and the stipulation of the parties. Apart from fraud, the year 1949 is open under the 3-year statute of limitations, because the deficiency notice was sent within that period as extended by consent. The years 1944, 1945, and 1948 are open under the 5-year statute, since petitioner’s omissions from gross income for each of those years exceeded 25 per cent of the gross income reported, and the deficiency notice was sent within the 5-year period as extended by consents. The deficiency notices with respect to the remaining years were sent after the 5-year periods had expired, but those years are nevertheless open as a result of our finding of fraud. 4. The remaining question involves the returns filed for the years 1939-1942, inclusive. Petitioner Emilie Furnish Funk contends that these returns were not joint returns and that she is not liable for any part of the deficiencies and additions to tax for fraud found to be due for those years. Under section 51 (b) of the 1939 Code,[4] if a joint return is filed by a husband and wife living together, they are jointly and severally liable for the full tax liability. Such liability covers not only the basic tax but also any addition to the tax on account of fraud, notwithstanding that the wife may have signed the return in blank and that she was innocent of the fraud; indeed such liability extends to the wife with respect to a joint return even where she failed to sign it, provided that it was intended to be a joint return. Joseph Carrero, 29 B. T. A. 646, 650; Myrna S. Howell, 10 T. C. 859, 866, affirmed 175 F. 2d 240 (C. A. 6); W. L. Kann, 18 T. C. 1032, 1044, affirmed 210 F. 2d 247 (C. A. 3), certiorari denied 347 U. S. 967; Dora S. Hughes, 26 T. C. 23, 28-29; Arthur N. Dellit, 24 T. C. 434; cf. Jack Douglas, 27 T. C. 306, 314, but cf. at 315. Cf. also Muriel Heim, 27 T. C. 270. The returns filed for the years 1939-1942, inclusive, were signed by both spouses. It is quite true that the name of the husband only appeared in the caption of each return over the printed words, “Use given names of both husband and wife, if this is a joint return.” But in each return his wife’s signature as well as his own appeared over the printed words, “If this is a joint return * * *, it must be signed by both husband and wife.” The returns were prepared by the husband after the wife had signed them in blank. On each return credits for four dependent children and for personal exemption for husband and wife were claimed. The income shown on the returns represented earnings of the petitioner from his medical practice. Such earnings constituted community property under the laws of California where petitioners resided. See Marjorie Hunt, 22 T. C. 228, 230. This community income could be reported in its entirety in a joint return, or in separate returns, each spouse reporting one-half. Petitioners filed only one return for each of the years in question. If Emilie Furnish Funk deemed these returns to be separate returns of her husband, she should have filed separate returns for each year reporting her one-half of the community income. She did not do so. We are convinced that the returns filed for the years 1939-1942, inclusive, were intended to be and were in fact joint returns of the petitioners, unless there is merit to the wife’s contention that she signed the returns under duress. A signature made under duress is considered an involuntary act which may be viewed as never having occurred. She asks us to find that she signed the returns in blank because she was “in fear of violence if she refused.” The principal evidence before us in that connection is the following testimony given by her in response to questions asked by her attorney: Q. Mrs. Funk, you testified that you did sign these returns in blank? A. I did. Q. Now, can you explain the circumstances surrounding that signing of the return in blank? How did it happen and where was it, at home, in the oflice, or how? A. It was at home. The Doctor never got home before about 2: 00 a. m., and he would come in with his forms and say, “Oh, I have to make these out tonight and it will take me most of the night. Just sign here and go up to bed.” Q. Did he say it in a nice way or in a harsh manner? A. Well, most of the time he was very harsh. Q. Then you would sign the return and go up to bed, is that correct? A. Tes, sir. Q. Mrs. Funk, did you sign these returns in blank because you were afraid of Dr. Furnish ? A. Yes, sir, I was. Q. Had there been some prior difficulties in your marriage which made that fear reasonable? A. There certainly were. Q. Many incidents? A. Many. This testimony does not establish that she signed each or any one of the four returns under duress. It is not enough for her to say in general terms in response to leading questions that she was “afraid” of petitioner and that “many incidents” had occurred in her marriage that made this fear reasonable. She may or may not have been reluctant to sign these returns, but we think she has hardly established by such general testimony that she acted under duress or that her acts of signing were not of her own free will. We cannot find on this record that the “incidents” which caused her to be “afraid” of her husband were of such character as to produce a state of mind that would prevent the exercise of her free will. Fear that would justify a decision that a signature on a return was made in circumstances which destroyed the free will of the signer must have a sound basis in fact, and that basis must be shown. It has not been shown here. Cf. Estate of Merlin H. Aylesworth, 24 T. C. 134. We hold, therefore, that the returns fded for the years 1930-1942, inclusive, were joint returns of petitioners, and that each of them is jointly and severally liable for the deficiencies and additions to tax for fraud determined by the respondent for those years. We reach this conclusion with great reluctance, because it is plain upon this record not only that the wife was not guilty of fraud but that she, along with the Government, was a victim of the very fraud that has tolled the running of the statute of limitations against her and furnished the basis for the imposition of the so-called fraud penalty. The result is highly inequitable, but it appears to be required by the plain language of section 51 (b) and the cases applying it. To reach a contrary result with respect to her we would have to find that the returns were not in fact joint returns — a finding that cannot fairly be made on this record. The Congress has not committed to this Court the powers of a court of equity. Decisions will be entered for the respondent in Docket Nos. 51401, 51416, and 51417 (with the exception of the addition to tax for fraud for 1949). Decision will be entered for petitioner i/n Docket No. 5H02. She filed a separate return for 1943, but the Government concedes that there was no fraud with respect thereto, and since that year Is otherwise barred, it concedes that the deficiency proposed against her for that year was improperly determined. Petitioner, on brief, concedes the correctness of these further adjustments to' the extent of $3,992, representing the gifts of the two automobiles costing $1,400, and the 1948 Thomas Steel Company dividends In the amount of $2,592. A somewhat different method, based upon the Hill audit, was used for the years 1939 and 1940, where the returns were not available, but petitioner does not appear to challenge that method, if it is otherwise proper for the years 1941 — 1948. Internal Revenue Code of 1939. SEC. 51. INDIVIDUAL RETURNS. (b) Hosband and Wife.. — In the case of a husband and wife living together the income of each (even though one has no gross income) may be included in a single return made by them jointly, in which case the tax shall be computed on the aggregate Income, and the liability with respect to the tax shaU be joint and several. * * *