T.C. Memo. 2008-135

UNITED STATES TAX COURT

CHRYSTINA NIHISER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19315-04.                  Filed May 20, 2008.

<u>Steven L. Stern</u>, for petitioner.

<u>Kim Nguyen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Chrystina Nihiser was a stay-at-home mom. With only a small income from her own part-time work, she relied on her husband's law practice to support their family.  But his practice was only intermittently successful and, when financial troubles arrived, he stopped paying the taxes they owed.

She applied for innocent-spouse relief at a time when her life was becoming increasingly worse.  Her husband, it turned

out, was using drugs and stealing from his clients--eventually leading to his arrest and imprisonment. She now seeks relief from joint liability for a 1996-2001 tax debt of nearly a quarter-million dollars. Her case raises tricky questions of what evidence we can consider and how we should weigh it.

### FINDINGS OF FACT

Nihiser married Kevin Connolly in 1980. Connolly was a plaintiff's lawyer with a small practice, and Nihiser was a schoolteacher until 1988, when she gave birth to their daughter. During their marriage, Connolly controlled the family finances. He kept most of his income hidden from Nihiser by using a checking account in his law practice's name, and paid most of the family's expenses from this account. When Nihiser needed money, Connolly would give her a check from his account and she would deposit it in their joint checking account. Connolly himself never deposited money directly into the joint account.

He also kept Nihiser away from their tax returns, letting her see them only when he presented them to her for her signature. This was Nihiser's one chance each year to learn about Connolly's income. But Connolly lowered the odds of her noticing anything by showing them to her only on their due date. (The one return not signed on its due date was signed on April 14.) Connolly's accountants likewise signed the returns on or just days before their due date.

In 1993, Connolly began filing returns without paying the amounts due. Nihiser would see that they owed taxes, and she did ask Connolly how he planned on paying them. But Connolly would complain that his law practice's expenses were just too great, and promised her that one of his cases would settle, or a new business venture would pay off, and provide the needed funds. Nihiser believed him, but was naturally left uneasy by his answers. When she followed up, Connolly would berate her. And he never did pay the taxes due.

In 1997, Connolly tried to solve their financial difficulties by filing for bankruptcy. It was the couple's second trip to the bankruptcy courthouse. Their first--in 1993-- had already cost them their house. The 1997 bankruptcy discharged their 1993-95 tax liabilities, but the strains on their marriage only grew worse.

The problem was drugs. Nihiser had suspected that Connolly was using from about the time she gave birth to their daughter, and claimed--credibly, but without corroborating evidence--that the family doctor finally confirmed her suspicions when he told her that Connolly's blood tested positive for cocaine. Connolly finally admitted to drug use, during counseling as their marriage careened to its end. But he refused help and became enraged when she brought it up.

In 1998 Connolly and Nihiser filed their 1997 tax return, but Connolly again failed to pay the taxes shown as due. Nihiser intensified her efforts to get Connolly to satisfy their tax liability, but Connolly kept making the same empty promises. He also told her that she should continue to sign the returns because California's being a community-property state meant there was no way she could get out of being liable for half of the taxes anyway. Nothing changed with their 1998 tax return, and their unpaid tax liability continued to grow.

In July 1999, part of the routine did change: Connolly filled out divorce papers and gave them to her. Although he never filed the papers with a court, Nihiser thought (and we specifically find her testimony credible on this point) that they were legally separated. Only they did not literally separate. For the next five years, Connolly and Nihiser lived in separate rooms of the same apartment. During this time, Connolly continued to control their finances and pay the rent. The new living arrangement did not change their tax habits. In 1999 and 2000, Connolly and Nihiser again filed joint tax returns showing taxes owed.

In July 2001, Connolly felt that filing for bankruptcy a third time was the answer and convinced Nihiser to sign the petition. Then, in October 2002, Nihiser signed their 2001 tax return. It was to be their last return filed jointly. Nihiser

learned that Connolly had let their health insurance lapse, and for her this was the last straw. The next month she began looking for her own answer to their tax problems and learned about innocent-spouse relief. She filed a Form 8857, Request for Innocent Spouse Relief, and Form 12510, Questionnaire for Requesting Spouse, with the Commissioner to be relieved of liability for the unpaid taxes from 1996-2001.[1] She included with the two forms a letter describing her situation. Unbeknownst to Nihiser, Connolly had about this same time attracted the attention of the California State Bar, which began disciplinary proceedings against him for stealing money from his clients.

While the bar probe got under way, the Commissioner's Centralized Cincinnati Innocent Spouse Operations (CCISO) was reviewing Nihiser's claim for relief. In a March 2003 letter, CCISO denied her relief because she did not have reason to believe that Connolly would ever pay their taxes, given the years of unpaid balances--balances that kept on growing--and the couple's return trips to bankruptcy court. The letter also explained that the verbal abuse she suffered was not enough "of a factor to overcome continuing to file joint returns with balances due without taking corrective action." The CCISO workpapers,

---

[1] Her application included taxes for 1993 through 1995, but she evidently didn't realize that these had already been discharged in bankruptcy.

which were introduced at trial, gave more insight into the Commissioner's reasoning. They listed the various factors considered, but not always consistently. Few of the factors listed in those workpapers were even mentioned in the form letter that Nihiser received.

Nihiser then sent a "statement of disagreement" to the IRS's Appeals Office. She explained that Connolly had assured her that he would pay the taxes and that she had taken him on his word since he denied her access to their financial records. She also explained that, though she had returned to full-time teaching in January 2003, raising a child on her salary would be a hardship if she also had to pay the now very substantial back taxes. Near the end of her statement, Nihiser informed the Commissioner that when the IRS contacted Connolly about her request he got "extremely angry" and threatened to tell them that she had spent all their money.

Connolly may well have been upset for another reason--in November 2003, the ongoing state investigation triggered his resignation from the bar. He again kept Nihiser in the dark. In any event, she pressed forward by meeting that same month with the Appeals officer who was assigned to her case. He told her that IRS policy required him to contact Connolly about her request. He also asked her to supply more complete information about the couple's income and expenses. Nihiser credibly

testified at trial that she did not provide the Appeals officer with more information because she was afraid to ask Connolly about his finances.

In July 2004, the Appeals officer sent Nihiser a notice of determination denying her request for relief. The denial was based largely on his conclusion that she should have known when she signed returns the taxes were not going to be paid when she signed the returns. He found her stated belief that Connolly would pay the taxes unreasonable because of the couple's history of not paying taxes, the size of the underpayment, and their serial bankruptcies. (He also seemed to find that Nihiser failed to fulfill her duty to inquire about the amount of the couple's tax liability. This is odd, given that she always claimed that she knew the amount of the liabilities when she signed the returns and reported the exact amounts for each liability in her request for relief.)

The Appeals officer also found that paying the tax would not cause her economic hardship because she was still living with Connolly, commingling income and sharing expenses. He supported his conclusion by writing that when he asked Nihiser to provide more financial information, she decided to drop the issue. He recognized that the income on which the taxes were due was overwhelmingly Connolly's, but did not make any findings on any of the other factors the IRS routinely weighs in innocent-spouse

cases.  Nihiser, then as now a resident of California, responded
by filing a petition with our Court.  By the time of trial, state
police had arrested Connolly.  He was later convicted of grand
theft, and remains imprisoned.  We held a trial, though the
Commissioner objected to the introduction of all evidence not
contained in the administrative record.[2]

## OPINION

Section 6013(a)[3] lets married couples file their federal tax
return jointly but, if they do, both spouses are then responsible
for the return's accuracy and both are generally liable for the
entire tax due.  Sec. 6013(d)(3); Butler v. Commissioner, 114
T.C. 276, 282 (2000).  In some cases, however, section 6015 can
relieve a spouse from this joint liability.  Relief comes in
three varieties:  Relief under section 6015(b) or (c) requires
either an "understatement" or a "deficiency;" whereas relief
under section 6015(f) requires only that the requesting spouse be
"liable for any unpaid tax or any deficiency."  Therefore, if the
liability is neither an "understatement" nor a "deficiency", the

---

[2] The Commissioner continued his objection to the admission
of nonrecord evidence in his post-trial brief.  The findings of
fact in this background section reflect our consideration of
evidence presented at trial, and are not limited to the
stipulation and administrative record.  In the later sections of
this opinion, which analyze the individual factors considered in
deciding whether to grant relief, we will make separate findings
based on the administrative record and the record at trial.

[3] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue.

only possible relief is under subsection (f).  See Hopkins v. Commissioner, 121 T.C. 73, 87-88 (2003).

The Commissioner never asserted a deficiency against Nihiser, so hers is a case where relief is possible only under section 6015(f).  This turns out to be important in considering three preliminary questions:

!    jurisdiction;

!    standard of review; and

!    scope of review.

I.   Jurisdiction to Hear Cases Under Section 6015(f)

Our jurisdiction in this case is affected by its being not only a nondeficiency case, but a stand-alone nondeficiency case. A "stand-alone" case is one where the requesting spouse's claim for innocent-spouse relief was made under section 6015 on her own initiative, and not as part of a deficiency action or in response to the Commissioner instituting a lien or levy to try and collect the tax debt.  This distinction made Nihiser's one of a large number of cases affected first by the Ninth Circuit's opinion in Commissioner v. Ewing, 439 F.3d 1009 (9th Cir. 2006), revg. 118 T.C. 494 (2002), and vacating 122 T.C. 32 (2004), and then by this Court's opinion in Billings v. Commissioner, 127 T.C. 7 (2006).  Both these cases held that the Tax Court has no jurisdiction to review the Commissioner's determinations in stand-alone nondeficiency cases.  It seemed reasonably likely

that Congress would treat <u>Ewing</u> and <u>Billings</u> as having identified a glitch in the Code and would respond by amending section 6015, so we did not dismiss this case after deciding <u>Billings</u>, but waited to see what would happen.  Congress did respond by amending section 6015(e), giving us jurisdiction to review innocent-spouse determinations in either "the case of an individual against whom a deficiency has been asserted * * *, or in the case of an individual who requests equitable relief under subsection (f)."  Tax Relief and Health Care Act of 2006, Pub. L. 109-432, div. C, sec. 408(a), 120 Stat. 3061.  This amendment was effective for liabilities remaining unpaid on December 20, 2006. <u>Id.</u> sec. 408(c), 120 Stat. 3062.  After it became law, the parties stipulated that Nihiser's tax liability for the years in question remained unpaid on December 20, 2006.  We therefore have jurisdiction to review the Commissioner's determination.

II.  <u>Standard of Review</u>

That Nihiser's is a stand-alone nondeficiency case is also important in deciding what standard of review to use.  We review section 6015(b) and (c) stand-alone cases under a de novo standard, since in those cases we are determining the existence or amount of a tax liability.  See <u>Haltom v. Commissioner</u>, T.C. Memo. 2005-209; <u>McClelland v. Commissioner</u>, T.C. Memo. 2005-121.

In contrast, our standard of review in section 6015(f) stand-alone cases is for abuse of discretion, e.g., <u>Cheshire v.</u>

Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002), and it's Nihiser's burden to prove that the Commissioner committed one, see Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).[4] Courts generally hold that a decisionmaker abuses his discretion when it "'makes an error of law * * * or rests its determination on a clearly erroneous finding of fact * * * [or] applies the correct law to facts which are not clearly erroneous but rules in an irrational manner.'" Indus. Investors v. Commissioner, T.C. Memo. 2007-93 (quoting United States v. Sherburne, 249 F.3d 1121, 1125-26 (9th Cir. 2001)); see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402-03 (1990) (same).

III. Scope of Review

Our scope of review--i.e., what evidence we look at to decide whether the Commissioner abused his discretion--is likewise affected by this being a 6015(f) case. The Commissioner argues that we should look only at the administrative record compiled when Nihiser applied for relief from the IRS, met with IRS employees, and filled out (or didn't fill out) the relevant

---

[4] At least when, as here, the IRS has considered a request and rejected it. We leave to another day the question of whether the amendment to section 6015(e) will cause a different standard of review to apply to stand-alone nondeficiency petitions filed with us after six months of IRS inaction. See sec. 6015(e)(1)(A)(i)(II).

IRS forms.  For reasons discussed below, we need not further address the Commissioner's point.[5]

The scope of review is an even bigger problem in innocent-spouse cases when we find that the Commissioner abused his discretion.  Although rarely employed by district courts in reviewing administrative agency action, a trial de novo typically consists of independent factfinding and legal analysis unmarked by deference to the original factfinder.  See, e.g., Morris v. Rumsfeld, 420 F.3d 287, 292, 294 (3d Cir. 2005) (defining "trial de novo" as involving judicial review "without deferring to any prior administrative adjudication" and "entirely independent of the administrative proceedings"); Timmons v. White, 314 F.3d 1229, 1233-34 (10th Cir. 2003) (same); see also Wright & Koch, 33 Federal Practice and Procedure: Judicial Review of Administrative

---

[5] In the somewhat similar context of reviewing of notices of determination that the Commissioner issues in collection due process (CDP) cases under sections 6320 and 6330, we also engage in de novo review for abuse of discretion.  Robinette v. Commissioner, 123 T.C. 85 (2004), revd. 439 F.3d 455 (8th Cir. 2006).  As a reviewed opinion, it remains good law for our Court unless a case is to be appealed to the Eighth Circuit.  We have, however, since deciding Murphy v. Commissioner, 125 T.C. 301 (2005), affd. 469 F.3d 27 (1st Cir. 2006), declined to consider evidence that a  taxpayer might have presented (but chose not to) at a CDP hearing because "an appeals officer does not abuse her discretion when she fails to take into account information that she requested and that was not provided in a reasonable time." Id. at 315.  Similarly, in Giamelli v. Commissioner, 129 T.C. 107, 113 (2007), we found that "if an issue is never raised at [a hearing with the Appeals officer], it cannot be part of the Appeals officer's determination."

Action, sec. 8332, at 161-62 (2006).  In section 6015(f) innocent-spouse cases, however, precedent constrains us to combine the independent factfinding of a trial de novo with an abuse-of-discretion standard of review.

Another difference between our practice and district court review of administrative-agency action for abuse of discretion is that district courts generally are able to remand a case to the agency for reconsideration if the court holds that the agency's factfinding or legal analysis went awry.  Fla. Power Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); Virk v. INS, 295 F.3d 1055, 1060-61 (9th Cir. 2002) (remanding a denial by the INS of a motion to reopen proceedings where the INS failed to consider all relevant factors); see also Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 87 (2d Cir. 2006) (remanding an administrative decision to the Department of Health and Human Services after finding it was adopted in an arbitrary and capricious manner); Stuttering Found. of Am. v. Springer, 498 F.Supp.2d 203, 213-14 (D.D.C. 2007) (finding the Office of Personnel Management misapplied

Federal tax law when classifying a charitable organization and remanding the issue to the agency for a new factual determination under correct standards).  When this happens, the agency is able to compile a new (or at least supplemental) administrative record, and judicial review on remand can be done using an abuse-of-discretion standard applied against that record.[6]

Remand is not an option in innocent-spouse cases under current law.  In Friday v. Commissioner, 124 T.C. 220, 222 (2005), we held that "whether relief is appropriate under section 6015 is generally not a 'review' of the Commissioner's determination in a hearing but is instead an action begun in this Court."  Friday is a division opinion.  We must follow it.  See Sec. State Bank v. Commissioner, 111 T.C. 210, 213 (1998), affd. 214 F.3d 1254 (10th Cir. 2000); Hesselink v. Commissioner, 97 T.C. 94, 99-100 (1991).

IV.  Equitable Relief Under Section 6015(f)

Having unpacked this preliminary baggage, we turn to the case before us.  Section 6015(f) allows relief to a requesting spouse "if taking into account all the facts and circumstances, it is inequitable to hold the individual liable."  The Commissioner exercises his discretion using Revenue Procedure

---

[6] As is always the case in administrative law, general principles yield to any specific governing statute.  See, e.g. Nguyen v. Shalala, 43 F.3d 1400, 1403 (10th Cir. 1994) (outlining specific statutory remedies available to a court reviewing denial of Social Security disability claims).

2000-15, 2000-1 C.B. at 447, a framework guiding the exercise of his discretion when determining whether or not to grant equitable relief.  We also follow that revenue procedure in reviewing his determination and deciding what relief is appropriate.[7]  See, e.g., Washington v. Commissioner, 120 T.C. 137, 147-52 (2003); Jonson v. Commissioner, 118 T.C. 106, 125-26 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448, has seven general requirements that all requesting spouses must meet for relief under section 6015(f).  The Commissioner concedes that Nihiser meets all seven conditions.

The procedure also has a safe harbor.  This safe harbor grants relief to a requesting spouse if she meets three conditions.  Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448. The first requires that:

> At the time relief is requested, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse, or has not been a member of the same household as the nonrequesting spouse at any time during the

---

[7] Nihiser filed Form 8857 in November 2002, and received a preliminary determination letter in March 2003.  The procedure in effect when she filed her request for relief was Revenue Procedure 2000-15, 2000-1 C.B. at 447.  It has been superseded by Revenue Procedure 2003-61, 2003-2 C.B. at 296, but the new revenue procedure applies only to requests for relief filed on or after November 1, 2003, or those pending on November 1, 2003, for which no preliminary determination letter has been issued as of that date.  Id., sec. 7, 2003-2 C.B. at 299.  We therefore apply Revenue Procedure 2000-15 to this case.

> 12-month period ending on the date relief was
> requested;

id. sec. 4.02(1)(a). The parties agree that Nihiser was married when she requested relief, but she argues that her *de facto* separation qualifies as a legal separation. Nihiser offers no authority for her position, however. We don't need to consider this condition because Nihiser fails the second condition in this safe harbor test. As discussed below in section IV.D., Nihiser knew at the time she signed them, the tax shown on the joint returns would not be paid. So Nihiser does not qualify for the safe harbor.

This leaves an eight-factor balancing test to consider before deciding if relief would be "equitable." Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. 448-49. The Commissioner may consider other factors, but this is where he starts. Ewing, 122 T.C. at 47-48; Rev. Proc. 2000-15, sec. 4.03. We can summarize the eight factors in a table (those factors not in dispute are in italics):

| Weighs for Relief | Neutral | Weighs against Relief |
|---|---|---|
| Separated or divorced | Still married | N/A |
| Abuse present | No abuse present | N/A |
| *No significant benefit* | | Significant benefit |

| Weighs for Relief | Neutral | Weighs against Relief |
|---|---|---|
| N/A | *Later compliance with Federal tax laws* | Lack of later compliance with Federal tax laws |
| No knowledge or reason to know | N/A | Knowledge |
| Economic hardship if relief not granted | N/A | No economic hardship |
| *Tax liability attributable to non-requesting spouse* | N/A | Liability attributable to petitioner |
| Non-requesting spouse responsible for paying tax under divorce decree | *No divorce decree* | Petitioner responsible for paying tax under divorce decree |

The Commissioner conceded that the attribution factor weighs in Nihiser's favor, and that the significant-benefit, noncompliance-with-tax-laws, and nonrequesting-spouse's-legal obligation-to-pay-the-tax factors are neutral. We treat the parties' agreement that Nihiser received no significant benefit from the underpayment as weighing in her favor.[8] That leaves Nihiser disputing only the Commissioner's determination concerning the marital-status, knowledge, abuse, and hardship factors.

---

[8] Rev. Proc. 2000-15, sec. 4.03, does not state that the absence of a significant benefit will weigh in a petitioner's favor, but only that receiving a significant benefit will weigh against her. Nonetheless, we decided in Ferrarese v. Commissioner, T.C. Memo. 2002-249 (and other cases cited), that the absence of a significant benefit should be a positive factor for petitioners.

And here we meet the Commissioner's first abuse of discretion in this case--he simply failed to consider all the factors listed in Revenue Procedure 2000-15 when making his determination.  See <u>Walter Trans. Inc. v. United States</u>, 432 F. Supp. 2d 955, 959 (W.D. Mo. 2006) (citing <u>Sukhov v. Gonzales</u>, 403 F.3d 568, 570 (8th Cir. 2005) (stating that an abuse of discretion may be found where the Appeals officer fails to consider all factors presented); <u>Gall v. United States</u>, 552 U.S. ____, 128 S. Ct. 586, 607 (2007) (Alito, J., dissenting) (citing cases analyzing several areas of law that require consideration of all factors to avoid an abuse of discretion).  The Appeals officer made no findings on either the marital-status or abuse factors, and both these factors are at issue.  As we also find below, the Commissioner's determination on the economic-hardship factor was erroneous in failing to consider reasonably all the facts in the administrative record.  We therefore find that the Commissioner has abused his discretion, and examine the disputed factors with an eye to determining the appropriate relief available to Nihiser under section 6015.

This course of action follows from our holding in <u>Friday</u>. If we find an abuse of discretion, it is up to us--in the words of section 6015(e)--"to determine the appropriate relief available to the individual under this section" rather than remand the case to the IRS for a reopening of the administrative

record and a consideration for the first time of evidence we received during the trial.  And so we next ask not just whether the Commissioner abused his discretion in denying Nihiser relief, but, if he did, what is "the appropriate relief available?"

A.   Marital Status

The IRS's finding on the marital status factor is confusing. The CCISO's workpapers show that the initial IRS reviewer regarded Nihiser's situation as weighing in favor of relief, though leaving it unmentioned in the March 2003 letter to her. The subsequent notice of determination doesn't mention the factor at all, except summarily as one of "several factors * * * considered," so we have no idea how it was weighed in the end.

The revenue procedure itself is not a model of clarity on how the IRS should go about analyzing this factor.  In the section discussing qualification for the safe harbor, marital status is important, and we're told when to look and what to look for.  See supra p. 16.

But we have to look at the description of this factor in a different part of the Procedure, section 4.03(1)(a)'s description of when the marital-status factor weighs in favor of granting relief when applying the eight-factor balancing test.  This description is different--it says that marital status weighs in favor of relief when the "requesting spouse is separated (*whether legally separated or living apart*) or divorced from the

nonrequesting spouse." Rev. Proc. 2000-15, sec. 4.03(1)(a), (emphasis added). We infer from the absence of any reference to separate "households" in this description of the marital-status factor (in contrast to the safe harbor condition discussed supra) that spouses can be "living apart" even in the same household.

This is actually a good description of how Nihiser and Connolly were living when she requested relief in late 2002. Nihiser's intent, buttressed by her actions, shows that her relationship with Connolly was drastically changed on July 9, 1999, when he flourished divorce papers at her. From then on, they no longer shared a bedroom, and she reasonably thought that her husband had filed for legal separation--even reporting that day as the start of their legal separation on her forms requesting innocent-spouse relief. She explained on these forms that they remained under the same roof only because of their financial situation. We believe her, and find that she was "living apart" from her husband both when she requested relief and when the Commissioner made his determination. We thus agree with the apparent conclusion reached by the CCISO in its initial consideration of her request that this factor weighs in favor of relief. The Appeals officer making the Commissioner's final determination abused his discretion by not discussing and weighing this factor.

We are not certain that this is where our analysis of this factor should end.  As is often the case in the sort of troubled marriages that spawn requests for innocent-spouse relief, alienation became separation and finally divorce.  By the time of trial, Nihiser had without any doubt been living in a separate household--remember that by then her husband was an inmate--and filed for divorce as well.  So, if we are to follow Friday's command that we judge the merits of a request for innocent-spouse relief without remanding for additional factfinding, we would find on the basis of the trial record as well as the administrative record that this factor weighs in Nihiser's favor.[9]

B.  Abuse

The next contested factor is spousal abuse.  The revenue procedure doesn't actually define "abuse,"[10] but does say that proof that the "requesting spouse was abused by the nonrequesting

---

[9] Compare this analysis to the law governing judicial review in Social Security benefit cases cited supra note 6.  In those kind of cases, a court may remand a case to the Social Security Administration when new evidence arises that is material and where there is good cause for the late submission.  42 U.S.C. sec. 405(g) (2006).  There is no requirement that the new evidence existed when the agency first made its decision, though the new evidence must relate to the petitioner's condition on or before the date of that decision.  See Williams v. Barnhart, 178 Fed. Appx. 785, 792 (10th Cir. 2006).

[10] Black's Law Dictionary defines abuse as "physical or mental maltreatment, often resulting in mental, emotional, sexual, or physical injury."  Black's Law Dictionary 10 (8th ed. 2004).

spouse, but such abuse did not amount to duress," weighs in favor of relief. Rev. Proc. 2000-15, sec. 4.03(1)(c), 2000-1 C.B. at 449. And this obviously lets us infer that "abuse" is at least sometimes somehow lesser than "duress."

Duress is a concept we've had a lot to say about. Courts have long considered duress to be a reason to relieve a taxpayer from joint liability where her spouse coerces her to sign a tax return. See Furnish v. Commissioner, 262 F.2d 727, 733 (9th Cir. 1958); affg. in part and remanding in part Funk v. Commissioner, 29 T.C. 279 (1957); Stanley v. Commissioner, 81 T.C. 634 (1983); Brown v. Commissioner, 51 T.C. 116, 119-120 (1968); Stanley v. Commissioner, 45 T.C. 555, 565 (1966). Duress is a subjective analysis, where the "focus is on the mind of the individual at the relevant time in question, rather than on the means by which the given state of mind was induced." In re Hinkley, 256 B.R. 814, 825 (Bankr. M.D. Fla. 2000); see also Stanley, 45 T.C. at 561. An extreme case is "Sign the return or I pull the trigger." But in tax law duress means any constraint of will so strong that it makes a person reasonably unable to resist demands to sign a return. When that happens, innocent-spouse relief is unavailable even if she applies for it, because duress means the return isn't treated as joint. See Raymond v. Commissioner, 119 T.C. 191, 195-96 (2002); Brown, 51 T.C. at 120-21.

And there are also a good number of cases analyzing abuse-not-amounting-to-duress in considering whether one spouse knew or should have known about the other's wrongdoing.  E.g., Kistner v. Commissioner, 18 F.3d 1521, 1526 (11th Cir. 1994), revg. T.C. Memo. 1991-463; Estate of Brown v. Commissioner, T.C. Memo. 1988-297.  A classic instance is when abuse helps explain a spouse's failure to inquire about noncompliance with tax law.  E.g., Aude v. Commissioner, T.C. Memo. 1997-478 (finding that threats and intimidation explained why a requesting spouse didn't review or inquire about the joint returns); Makalintal v. Commissioner, T.C. Memo. 1996-9 (determining that, "in light of the frequent physical abuse" by the nonrequesting spouse and his "general refusal to discuss his business and financial affairs with petitioner, * * * petitioner's inquiry was reasonable and sufficient to satisfy her duty of inquiry").[11]

But it's abuse as a factor by itself, not just as a relevant bit of evidence about one spouse's state of knowledge, that we're looking for in this case.  This is an important point because it liberates us from focusing on the moment the return is signed-- the relevant abuse precedes that moment, but there's no suggestion in the Procedure or any other source of relevant law

---

[11] Rev. Proc. 2003-61, sec. 4.03(2)(b)(i), 2003-2 C.B. at 299, although not the revenue procedure that applies here, likewise states that a history of abuse by the nonrequesting spouse may mitigate a requesting spouse's knowledge or reason to know.

that limits our consideration of whether a spouse was abused only to abuse that causes a particular instance of noncompliance with the tax law.

This leads to the heart of our inquiry:  What is abuse for purposes of innocent-spouse relief?  Verifiable physical harm is likely sufficient.  See, e.g., McKnight v. Commissioner, T.C. Memo. 2006-155 (finding abuse where alcoholic nonrequesting spouse physically shoved, hit, cut, and beat the requesting spouse on multiple occasions, one of which left her on crutches).  But can psychological mistreatment in the absence of physical harm be "abuse"?  We think the answer to that question is "yes".  Being a xanthippe is not by itself enough, but we have recognized that a nonrequesting spouse can engage in mental, emotional, and verbal abuse sufficiently severe to incapacitate a requesting spouse in the same manner as a physically abusive spouse.  Compare Grubich v. Commissioner, T.C. Memo. 1993-194 (abuse found in extreme belittling and constant disparaging of the requesting spouse's contribution to the family business).

We are aware of the danger that requesting spouses, in trying to escape financial liability, may easily exaggerate the level of nonphysical abuse.  Innocent-spouse cases often spring from the dissolution of troubled marriages, and there is an obvious incentive to vilify the nonrequesting spouse.  Our cases therefore require substantiation, or at least specificity, in

allegations of abuse.  See, e.g., <u>Fox v. Commissioner</u>, T.C. Memo. 2006-22 (weighing abuse as a positive factor where a police report corroborated the requesting spouse's claim of assault); <u>Knorr v. Commissioner</u>, T.C. Memo. 2004-212 (finding no abuse where requesting spouse provided only generalized claims of physical and emotional abuse); <u>Collier v. Commissioner</u>, T.C. Memo. 2002-144 (finding no abuse in absence of specific details).

We have also hesitated to find abuse when marital conflict is understandably distressing but doesn't significantly alter a requesting spouse's behavior.  See, e.g., <u>Krasner v. Commissioner</u>, T.C. Memo. 2006-31 (spouse didn't hesitate to leave her children with nonrequesting spouse, and police reports reflected little evidence of unwanted physical contact or mental abuse); <u>Ogonoski v. Commissioner</u>, T.C. Memo. 2004-52 (lack of abuse in the anxiety caused by uncertainty as to whether nonrequesting spouse would pay taxes); <u>Ewell v. Commissioner</u>, T.C. Memo. 1988-265 (no abuse where there was domineering but no physical abuse or mental intimidation).

This is not a terribly well-developed corner of tax law, and it is not one in which we can really get much help by looking at detailed regulations or the ordinary canons of construction. So we think it at least helpful to look at those factors widely recognized as psychologically abusive where law has confronted

domestic violence.  Scholars have identified a number of factors that are common features of domestic abuse in domestic-relations law and the subfield of criminal law arising from domestic violence.  In these fields, a psychologically abusive spouse is one who may:  (1) isolate the victim; (2) encourage exhaustion by, for example, intentionally limiting food or interrupting sleep; (3) behave in an obsessive or possessive manner; (4) threaten to commit suicide, to murder the requesting spouse, or to cause the death of family or friends; (5) use degrading language including humiliation, denial of victim's talents and abilities, and name calling; (6) abuse drugs or alcohol, including administering substances to the victim; (7) undermine the victim's ability to reason independently; or (8) occasionally indulge in positive behavior in order to keep hope alive that the abuse will cease.[12]

Although we're certainly not prepared to make these factors an exclusive list of what to look for--human perversity being unimaginably creative--they at least give us some objective indications that abuse, and not just a deviation from the ideal of marital harmony, is what we're seeing.  We think these factors indicate a relationship in which there is enough abuse to make it

---

[12] See Mary Ann Douglas (Dutton), "The Battered Woman Syndrome," in Domestic Violence on Trial: Psychological and Legal Dimensions of Family Violence 39 (Daniel Jay Sonkin ed., 1987) (citing L. Walker, The Battered Woman Syndrome (1984)).

reasonable to conclude that the spouse seeking relief was less likely to do what the Tax Code requires--making it more equitable to relieve her from joint liability. We again stress, though, that our consideration in such an underdeveloped area has to be case by case. See, e.g., Sjodin v. Commissioner, T.C. Memo. 2004-205, vacated and remanded on another issue 174 Fed. Appx. 359 (8th Cir. 2006) (finding no mental abuse where nonrequesting spouse was merely controlling and secretive).

In this case, the administrative record provides the following account of psychological abuse: On the Form 8857, Nihiser checked the box indicating that she had "been a victim of domestic abuse and [feared] that filing a claim for innocent-spouse relief [would] result in retaliation." She repeated her claim that she was the victim of abuse on her questionnaire and in her letter, writing that her husband verbally abused her. She also stated that he had a drug problem and she offered to provide copies of positive urine test results from his counselor. She also said that she filed a police report after he told her he had a gun and made a suicide threat. Neither CCISO nor the Appeals officer asked Nihiser for any such specific allegations--she supplied them *sua sponte*. The administrative record tells us that Nihiser feared her husband, and she stated in her paperwork that she blamed his abusive behavior on cocaine. On her request for relief, she offered to provide the Commissioner with a

statement from her neighbor attesting to the abuse, but neither CCISO nor the Appeals officer followed up. She claimed that he threatened to leave her and stick her with their tax bill. CCISO agreed that Nihiser suffered verbal abuse, but conclusorily dismissed it as not "enough of a factor to overcome continuing to file joint returns with a balance due without taking corrective action." And, as with the marital-status factor, the Appeals officer who actually issued the notice of determination didn't discuss the factor at all.

The trial record reinforced the abuse allegations Nihiser made during the administrative process. She credibly testified to her husband's hot temper, describing a situation in which he used foul language while upbraiding Nihiser in front of their daughter. She said she was intimidated by his controlling behavior to the point that she was in fear of her safety and the wellbeing of their daughter. Considering the factors suggestive of psychological abuse that we listed above--the threat of suicide, the reasonable fear in someone economically dependent on her spouse of being left without support, and the always lurking explosive potential of someone abusing illegal drugs--we find that Nihiser has shown, both in the administrative record and the record assembled at trial, that the abuse factor should weigh in her favor.

C.   Economic Hardship

The next contested factor is whether forcing Nihiser to pay the tax debt would cause her economic hardship.  This factor weighs in a requesting spouse's favor when satisfaction of the tax liability will cause her to be unable to pay her "reasonable basic living expenses."  Sec. 301.6343-1(b)(4), Proced. & Admin. Regs.[13]  In determining a reasonable amount for basic living expenses, the Commissioner looks at any information provided by the requesting spouse.  See sec. 301.6343-1(b)(4)(ii), Proced. & Admin. Regs.

And Nihiser did at least partially fill out the relevant section of the form.  When CCISO looked at it, an IRS employee tapped into IRS records and confirmed the bankruptcy filings and absence of income reported from third parties.  In considering the safe-harbor factors, this seems to have been enough to cause CCISO to conclude that "the requesting spouse will suffer economic hardship."  But then, on the same page of the workpaper, the employee listed lack of economic hardship as a factor weighing against relief:

> she is saying yes but her statement shows no
> income at all, she has been separated from
> him since 1999 and still is paying 2,000 per

---

[13] In order to determine whether a requesting spouse will suffer economic hardship, the revenue procedure directs us to the test in section 301.6343-1(b)(4), Proced. & Admin. Regs.  See Rev. Proc. 2000-15, secs. 4.02(1)(c), 4.03(1)(b), (2)(d), 2000-1 C.B at 448-49.

month for rent or mortgage, her expenses are
very high like $200 month for clothings.

How this weighed in the IRS's first round of consideration is unclear, since economic hardship isn't even mentioned in the March 2003 letter. The IRS's decision at the Appeals level is easier to understand. The Appeals officer determined that Nihiser would not suffer economic hardship because her and her husband's combined salaries were greater than their reasonable basic living expenses. This was almost certainly due to Nihiser's having left part of the "average monthly household income and expenses" section of the questionnaire blank because she didn't know of Connolly's income.[14] Nihiser told him that she was scared to press Connolly on the question, and so would drop the issue.

Here we again run into the problem of what time we should be looking at to judge which way this factor weighs. When she applied for relief, Nihiser's own income was a meager couple thousand dollars a year from part-time teaching. By the time that the Appeals officer met with her in November 2003, she'd

---

[14] Nihiser listed her monthly expenses as:

| | |
|---|---|
| Rent | $2,000 |
| Food | 500 |
| Utilities | 300 |
| Telephone | 65 |
| Auto insurance | 100 |
| Auto – gas and repairs | 250 |
| Clothing | 200 |
| Total living expenses | $3,415 |

returned to full-time teaching at a salary of about $68,000 and she remained employed full time at the time of trial. However, by the time of trial her wages were being garnished to pay a substantial state-tax debt left over from her marriage.

The Appeals officer quite understandably didn't spend too much time pondering such subtleties. And a refusal to supply information is ordinarily, of course, more than enough reason for the IRS to consider an issue conceded. See McCoy Enters, Inc. v. Commissioner, 58 F.3d 557, 563 (10th Cir. 1995) (can't exercise discretion if there is no information about a factor), affg. T.C. Memo. 1992-693; Chimblo v. Commissioner, T.C. Memo. 1997-535 (same), affd. 177 F.3d 119 (2d Cir. 1999). But Nihiser credibly testified that when she met with the Appeals officer to further explain her situation, she was deterred from presenting more complete financial information by the Appeals officer's statement that he would need to contact her husband again, and that she would need to ask him about his finances. We find these statements are highly likely to have kept some of this information off the record. In a case like this, where a petitioner credibly cites fear as a reason for not seeking relevant information, we find that the Appeals officer abused his discretion by not probing further. The regulation does, after all, tell him to consider all available information when making

economic hardship determinations.  See sec. 301.6343-1(b)(4), Proced. & Admin. Regs.

We need not consider evidence outside the administrative record to conclude that the Appeals officer clearly erred in finding that Nihiser wouldn't suffer economic hardship.  She was, when the case was before him, a schoolteacher in her mid-50s living in Orange County with no asset other than an 18-year-old car.  She was also supporting a teenage daughter.  The CCISO had checked the IRS's own records and found the history of bankruptcy filings and lack of any third-party payments to Nihiser and Connolly.  It thus should have been screamingly obvious that she would not be able to meet her basic living expenses if she had to pay a tax liability of more than $200,000.  We also do not need the evidence presented at trial to determine that Connolly's financial contributions would soon end.  The two had serious marital problems, he had a substance-abuse problem, and they had declared bankruptcy three times.

There is yet another possibly difficult question hidden here:  When do we take the snapshot of a spouse's finances to decide if paying the overdue taxes would wreak a financial hardship?  The Appeals officer was understandably looking at her situation at the time of his conference with her.  But under Ewing and Friday, we do not have to confine ourselves to the administrative record.  We think this means that, in gauging how

to weigh the economic-hardship factor, we should (at least once we've found there to have been an abuse of discretion, and so have to determine what relief should be available under section 6015) look at the evidence presented at trial, and the state of her finances at that time. These only support her request--by the time of trial, Connolly was in prison and thus was in no position to contribute to her support. She had resumed teaching, but her salary was about $5700 a month. On her request for relief, she reported $3415 in basic living expenses. These are reasonable expenses for a mother and daughter living in Orange County, California. At trial she also credibly testified that she has two additional reasonable monthly expenses: $480 tuition for her daughter and $500 to pay the Franchise Tax Board for her and her husband's California tax debt. After subtracting state taxes, federal income taxes, and Social Security and Medicare taxes, we find that Nihiser's current expenses use up most of her income. But we must also consider Nihiser's future ability to earn her current salary and pay her basic living expenses. She restarted her career late in life, and does not have a home or other assets to rely on after she retires. We find that if she is required to pay over $200,000 in taxes she will not be able to pay her basic living expenses. We find that the economic-hardship factor weighs in favor of relief.

D.    Knowledge

The last contested factor is Nihiser's knowledge of the underpayment.  This factor weighs against relief if she "knew or had reason to know * * * the reported liability would be unpaid at the time the return was signed."  Rev. Proc. 2000-15, sec. 4.03(2)(b), 2001-1 C.B. at 449.  We agree with the Commissioner that this factor does weigh against Nihiser.  At the time she signed the returns she did have reason to know the taxes would not be paid.  She and Connolly had filed for bankruptcy once when she signed the 1996 return, twice when she signed the 1997-2000 returns, and three times when she signed the 2001 return, and they had not made any other effort to pay their taxes.  She also suspected that her husband's continuing drug habit was contributing to their financial problems.  We find no error in the Commissioner's finding on this point, and so find that he did not abuse his discretion in concluding that this factor weighs against relief.  We find likewise on the basis of the trial record.  The knowledge factor therefore weighs against granting relief.

## Conclusion

After analyzing these contested factors, whether looking only at the administrative record by itself or as supplemented by the trial record, we find that the table should now look like this:

| Weighs for Relief | Neutral | Weighs against Relief |
| --- | --- | --- |
| Marital Status | | |
| Abuse | | |
| No significant benefit | | |
| | Later compliance with Federal tax laws | |
| | | Knowledge |
| Economic hardship | | |
| Attribution | | |
| | No divorce decree | |

Thus, Nihiser has five factors weighing in favor of relief and only one weighing against.  But the factor weighing against relief is knowledge, and the revenue procedure tells us that knowledge is an "extremely strong factor weighing against relief."  Rev. Proc. 2000-15, sec. 4.03(2)(b), 2000-1 C.B. 449.

The Commissioner's own procedure nevertheless anticipates at least some cases where knowledge or reason to know will not be enough to deny relief:  "Nonetheless, when the factors in favor of equitable relief are unusually strong, it may be appropriate to grant relief under § 6015(f) in limited situations where a requesting spouse knew or had reason to know that the liability would not be paid."  Id.  A case like this one, where the only factor weighing against relief is knowledge of underpayment and all the other factors are neutral or in her favor, is logically

the most likely to be one of these "limited situations" where relief is appropriate.

As in any multifactor balancing test, we must have something in mind as the appropriate fulcrum when there are factors weighing down both sides of the lever. And here we think that an appropriate fulcrum is the extent to which the economic unity of the household filing a joint return has been broken down by the actions of the nonrequesting spouse in a way that didn't allow the requesting spouse a reasonable exit. As the Third Circuit once wrote, the innocence we look for "within the meaning of this statute is innocent vis-a-vis a guilty spouse whose income is concealed from the innocent and spent outside the family." Bliss v. Commissioner, 59 F.3d 374, 380 n.3 (2d Cir. 1995) (discussing former section 6013), affg. T.C. Memo. 1993-390. The knowledge factor's unique importance is, seen in this way, entirely appropriate because in the ordinary course of events knowing her husband is mishandling their joint return would allow a wife to begin to pull away from the entanglement of joint liability. We therefore find on the peculiar facts of this case that Nihiser's knowledge of her husband's underpayment of their taxes is outweighed by the abuse she suffered and her utter lack of any benefit from the money. He kept her from seeing the broader state of the family's finances and spent the money on himself. And since she began filing on her own, she has consistently

followed the tax law and paid her current taxes as they became due. Her ability to act in response to her knowledge as her marriage was dissolving was thus so reduced as to make relieving her from the joint tax liability for the years in question the appropriate relief under section 6015.

Decision will be entered for petitioner.